IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KIRKLYNN FERRELL,
      Petitioner,

vs.                         Case No.:  4:15cv220/MW/EMT

JULIE L. JONES,
      Respondent.
_____/

## <u>REPORT AND RECOMMENDATION</u>

This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 33).  Petitioner filed a reply (ECF No. 43).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The procedural background of this case is undisputed and established by the state court record (ECF No. 33).[1]  Petitioner was charged in the Circuit Court in and for Gadsden County, Florida, Case No. 2008-CF-649, with one count of aggravated battery (Count I), two counts of aggravated assault with a firearm (Counts II and III), one count of aggravated child abuse with a firearm (Count IV), one count of battery on a law enforcement officer (Court V), and one count of resisting an officer with violence (Count VI) (Ex. A at 3–4).  Following a jury trial, Petitioner was found guilty as charged on Counts I, II, III, and IV; he was found not guilty on Count V, and he was convicted of a lesser included offense (resisting an officer without violence) on Count VI (Ex. A at 47–53, Exs. V, W).  On March 4, 2010, the court sentenced Petitioner to concurrent mandatory minimum terms of twenty (20) years in prison on Counts II, III, and IV, with a term of life on probation to follow his prison sentence on Count IV; a term of fifteen (15) years in prison on Count I, to run concurrently with the sentences on Counts II, III, and IV; and time served on Count VI (Ex. A at 96–107).  The court granted Petitioner 372 days of pre-sentence jail credit (*id.*).

Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D10-1166 (Ex. C).  The First DCA affirmed the judgment per

---

[1] Hereinafter all citations to the state court record refer to the electronically filed exhibits to Respondent's answer (ECF No. 33) unless otherwise indicated.  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

curiam without written opinion on June 16, 2011 (Ex. D). <u>Ferrell v. State</u>, 63 So. 3d 753 (Fla. 1st DCA 2011) (Table). The mandate issued July 5, 2011 (*id.*).

On April 23, 2012, Petitioner filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. E). Petitioner retained counsel and filed an amended motion (Ex. F). The state circuit court initially denied five of Petitioner's claims (Grounds 1 and 3–6), granted an evidentiary hearing on one claim (Ground 2), and deferred ruling on one claim (Ground 7) (*see* Exs. G, H). The court subsequently expanded the evidentiary hearing to include one of the previously denied claims (Ground 4) (Exs. G, H). The court held a limited evidentiary hearing on July 9, 2013 (Ex. I). The court denied the Rule 3.850 motion in an order rendered July 15, 2013 (Ex. J). Petitioner appealed the decision to the First DCA, Case No. 1D13-5661 (Exs. K, L). The First DCA affirmed the lower court's decision per curiam without written opinion on October 3, 2014, with the mandate issuing October 21, 2014 (Ex. M). <u>Ferrell v. State</u>, 149 So. 3d 3 (Fla. 1st DCA 2014) (Table). Petitioner timely filed a motion for rehearing (Ex. N). The First DCA denied the motion for rehearing on November 19, 2014 (Ex. O).

During the pendency of the Rule 3.850 proceeding, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D13-3166, alleging ineffective assistance of appellate counsel (Ex. P). The First DCA denied the petition on the

merits on December 5, 2013 (Ex. Q).  <u>Ferrell v. State</u>, 129 So. 3d 1103 (Fla. 1st DCA 2013) (Mem).

On February 9, 2015, Petitioner filed a petition for writ of habeas corpus in the Supreme Court of Florida, Case No. SC15-249 (Ex. R).  The state supreme court dismissed the petition for lack of jurisdiction on February 13, 2015 (Ex. S).  <u>Ferrell v. State</u>, 163 So. 3d 509 (Fla. 2015) (Table).

Petitioner commenced the instant federal habeas action on April 14, 2015 (ECF No. 1).

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19. Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > **(1)**  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> **(2)**  resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review

in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The

appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under
> the "unreasonable application" clause, a federal habeas court may grant
> the writ if the state court identifies the correct governing legal principle
> from this Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the Williams framework, on any issue raised in a federal habeas

petition upon which there has been an adjudication on the merits in a state court

proceeding, the federal court must first ascertain the "clearly established Federal law,"

namely, "the governing legal principle or principles set forth by the Supreme Court at

the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63,

71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" only

when a Supreme Court holding at the time of the state court decision embodies the

legal principle at issue.  Thaler v. Haynes, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed.

2d 1003 (2010); Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464

(2015) ("We have explained that clearly established Federal law for purposes of §

2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's

decisions.") (internal quotation marks and citation omitted).

   After identifying the governing legal principle(s), the federal court determines

whether the state court adjudication is contrary to the clearly established Supreme

Court case law.  The adjudication is not contrary to Supreme Court precedent merely

because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only if

either the reasoning or the result contradicts the relevant Supreme Court cases.  Early

v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e]

pitfalls [of § 2254(d)(1)]  does not require citation to our cases—indeed, it does not

even require awareness of our cases, so long as neither the reasoning nor the result of

the state-court decision contradicts them.").  Where there is no Supreme Court

precedent on point, the state court's conclusion cannot be contrary to clearly

established federal law.  See Woods, 135 S. Ct. at 1377 (holding, as to claim that

counsel was per se ineffective in being absent from the courtroom for ten minutes

during testimony concerning other defendants:  "Because none of our cases confront

the specific question presented by this case, the state court's decision could not be

contrary to any holding from this Court." (internal quotation marks and citation omitted)).  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See* Panetti v. Quarterman, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court.  Williams, 529 U.S. at 409; *see* Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam).   In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."   Harrington, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

Woods, 135 S. Ct. at 1376 (quoting Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See* Gill v. Mecusker, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable application" clause, the federal court applies an objective test.  Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").  Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance."  Brumfield v. Cain, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct.  28 U.S.C. § 2254(e)(1).  The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*; *see, e.g.*, Miller-El, 537 U.S. at 340 (explaining that a

federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").  Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications.  *See* <u>Cave v. Sec'y for Dep't of Corr.</u>, 638 F.3d. 739 (11th Cir. 2011).  However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision."  <u>Gill</u>, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied the AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* <u>Panetti</u>, 551 U.S. at 954.  Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this standard is difficult to meet, that is because it was meant to be."  <u>Richter</u>, 562 U.S. at 102.

Within this framework, the court will review Petitioner's claims.

III.   PETITIONER'S CLAIMS

A.   <u>Ground One:  "Counsel rendered ineffective assistance of counsel by failing to move for a mistrial based on juror's response when polled."</u>

In Petitioner's presentation of Ground One, he asserts claims of trial court error, ineffective assistance of trial counsel ("IATC"), and ineffective assistance of appellate counsel ("IAAC") with respect to circumstances that arose during the trial court's post-verdict jury poll (ECF No. 1 at 4–5; ECF No. 43 at 7–18).[2]  Petitioner's factual assertions are the following:

> After the jury's verdict was read, defense trial counsel requested that the jury be polled, juror Gwendolyn Hall answered that the verdicts were not hers, that she did not believe Appellant was guilty as charged. Defense counsel never objected that the poll be stopped or called for a mistrial. The court carefully permitted the juror to express her concerns regarding the verdict as to each count.
>
> The juror affirmed the verdict as to Counts 4 and 5 but vacillated regarding the other count. The court expressed no approval or disapproval regarding these statements.

(ECF No. 1 at 4).  Petitioner claims that the trial court erred by "confronting juror instructions" and placing undue pressure on Juror Hall to surrender her minority view of Petitioner's innocence, which resulted in a coerced verdict (*id.*).  Petitioner contends

---

[2] The page references of the parties' pleadings reflect the page numbers automatically assigned by the court's electronic docketing system.

Case No.:  4:15cv220/MW/EMT

the trial court error violated his rights under the Fifth, Sixth, and Fourteenth Amendments, as well as state and federal procedural rules governing criminal proceedings (*id.* at 4–5).

Petitioner claims that appellate counsel was ineffective for failing to raise the issue of trial court error on direct appeal, which caused a procedural default of the claim (ECF No. 1 at 4–5). Petitioner asserts his appellate counsel told him that trial counsel did not preserve the issue for appeal, and the issue did not have merit (*id.* at 5). Petitioner claims that the ineffectiveness of his appellate counsel violated the Sixth Amendment and "caused a manifest injustice that would excuse [Petitioner's] procedural default" (*id.*).

Petitioner also contends the state court committed reversible error by denying his post-conviction claims concerning improper polling of Juror Hall (ECF No. 1 at 4). Petitioner argues in his reply brief that his trial counsel rendered ineffective assistance by failing to move for a mistrial when Juror Hall indicated during post-verdict polling that the verdicts were not hers, and she did not believe that Petitioner was guilty as charged (ECF No. 43 at 7–18). Petitioner contends trial counsel should have immediately stopped the proceedings by moving for a mistrial due to the inability of Juror Hall to agree with the guilty verdict (*id.*). Petitioner contends trial counsel also failed to object when the prosecutor mischaracterized, during a bench conference, what

Juror Hall said during the jury poll (ECF No. 1 at 4). Petitioner contends defense counsel's ineffectiveness continued when he failed to object to the trial court's continued polling of the jury and returning them for deliberations after providing supplemental instructions (ECF No. 43 at 7–18).

With regard to Petitioner's IATC claims, Respondent contends Petitioner did not exhaust the IATC claim relating to trial counsel's failure to object to the prosecutor's mischaracterization, during the bench conference, of Juror Hall's statements (ECF No. 33 at 25–26). Respondent contends that the sub-claim is thus procedurally barred from federal review (*id.*). Respondent appears to concede that Petitioner exhausted the other IATC sub-claims, i.e., relating to counsel's failure to insist on a mistrial during the jury poll and later in the proceedings (ECF No. 33 at 23–25). Respondent contends the state court's adjudication of those IATC claims was objectively reasonable (*id.*).

With respect to Petitioner's claim of trial court error, Respondent contends Petitioner failed to present the claim on direct appeal; therefore, it is unexhausted and procedurally barred (ECF No. 33 at 26).

Finally, with respect to Petitioner's IAAC claim, Respondent concedes that Petitioner presented this claim to the First DCA in a state habeas petition (ECF No. 33 at 26–29). Respondent contends the state court's adjudication of the claim was not

objectively unreasonable, nor was it contrary to or an unreasonable application of clearly established federal law (*id.*).

To provide a factual context for Petitioner's claims, the undersigned will fully set forth the circumstances of the trial proceedings at issue, as evidenced by the trial transcript.  Upon the bailiff's informing the court that the jury had reached a verdict, the jury entered the courtroom, and the foreman announced that the jury had reached a verdict as to each of the six counts with which Petitioner was charged (Ex. V at 217). The trial court published the verdicts, which were guilty as to Counts I, II, III, IV, and VI (as to a lesser offense), and not guilty as to Count V (*see* Ex. A at 43–46, Ex. V at 217–19).  The court asked whether any party wished for the jury to be polled, and defense counsel, Attorney Akbar, responded yes (Ex. V at 219).  The following occurred:

> THE COURT:  Okay.  Virgil Wagner, where are you?  Okay. You heard me announce the verdicts as to each count, as well as the answers to the special questions.  Were those in fact, all of them, your individual verdicts?
>
> THE JUROR:  Yes.
>
> THE COURT:  Janice Del Signore, is that your individual verdict as to each of the counts?
>
> THE JUROR:  Yes.
>
> THE COURT:  And your answers to the special questions?

THE JUROR:  Yes.

THE COURT:  Suzanne Johnson, you heard me announce the verdicts as to each count and the special questions.  Were those your individual verdicts and answers?

THE JUROR:  Yes.

THE COURT:  Rufus Peoples, you heard me announce the verdicts as to each of the six counts, and the answers to the special questions. Were those in fact your individual verdicts?

THE JUROR:  Yes.

THE COURT:  Gwendolyn Hall, as to each of the verdicts that I read out loud, as well as the answers to the special questions, were those your individual verdicts?

THE JUROR:  Yes, with regrets.

THE COURT:  Okay.  Something you would like to explain, or do you have any—do you have any reservation about the decision, because I can send you all back to deliberate—

THE JUROR:  They will kill me if you send me back, but it is with regret.  I wanted a lot of lesser charges, but that's okay.

THE COURT:  We'll address this issue in a moment.  Mr. Richard Chase, you heard me announce the verdicts as to each of the counts, and is that in fact your individual verdict as to each count?

THE JUROR:  Yes, ma'am.

THE COURT:  And your answers to the special questions?

THE JUROR:  Yes, ma'am.

THE COURT:  All right.  Let me, in an abundance of caution—Ms. Hall, right?

THE JUROR:  Yes.

THE COURT:  As to—let me address these individually, just so that we can be sure and make a good record here.

Count 1 was aggravated battery, Kisha Ferrell, and that was signed as guilty as charged.  Is that—when you say with regrets, do you include that count, or is that count you have no reservation?

THE JUROR:  I have reservation on that count; however, it says intentionally or willfully or some terminology—

THE COURT:  —Let me stop you.  That is one of them?

THE JUROR:  Yes.

THE COURT:  You don't need to explain yourself.

THE JUROR:  Okay.

THE COURT:  Count 2 was guilty as charged of aggravated assault with a firearm, the named victim was Kisha Ferrell.   Did you have any reservation as to that count?

THE JUROR:  Yes.

THE COURT:  Okay.  As to Count 3, where the named victim— it's aggravated assault with a firearm, victim named Khari Wilkerson, did you have any reservations as to that count?

THE JUROR:  No.

THE COURT:  And just to be certain, it was guilty as charged of aggravated assault with a firearm, victim Khari Wilkerson, and the

answer to both the special questions on actual possession of a firearm and actual discharge of a firearm were both yes. Do you have no reservation as to that?

THE JUROR:  I did.

THE COURT:  You did or didn't?

THE JUROR:  I did.

THE COURT:  You did have a reservation?

THE JUROR:  (Nodding head affirmatively).

THE COURT:  Do you now?

THE JUROR:  Yes.

THE COURT:  Okay.  Thank you.  Count 4 was aggravated child abuse with the victim being Khari Wilkerson.  Did you have a reservation about that charge?

THE JUROR:  No.

THE COURT:  And to make it perfectly clear, that's one where there also was the special questions of actual possession of a firearm and actually discharging a firearm, and the answer was yes.  So do I understand you correctly about that count?  You do not have any reservation about that?

THE JUROR:  That's correct.

THE COURT:  Okay.  Count 5 was not guilty of battery on a law enforcement officer.  Did you have any reservations about that count?

THE JUROR:  No.

THE COURT:  And Count 6 was guilty of the lesser offense of resisting without violence.  Did you have any reservations about that verdict?

THE JUROR:  Yes.

THE COURT: You did?

THE JUROR:  Yes.

THE COURT:  Let me send the jury back right now.  I need to discuss what to do with the attorneys.  Thank you.

(Whereupon, the jury left the courtroom, and the following proceedings were had).

THE COURT:  Okay.  Suggestions?

MR. ALLMAN [the prosecutor]:  Well, Judge, I think it's acceptable for jurors to have regrets either way their verdict goes.  The question was, and it was made clear to them, was the State's case proven beyond a reasonable doubt.  And if she is saying yes, then the verdicts are true and they're acceptable.  I mean, I don't know that anybody in a case like this doesn't find somebody guilty and have regrets about it.  I mean, I guess we could explore what regrets she has.

THE COURT: Well, she stated yes, with regrets.  And then she did start to talk about—so I'm a little—well, they will kill me, whatever. I have to address the problem of making sure she understands her individual obligation to come to a conclusion; and if she's a hold out, she's a hold out.  What can I say?  I can put it in prettier language, but I think she has to know and understand, and that that's okay.

If it's not her verdict, it's not her verdict.  It's not a matter of well, all five agree but me, so therefore, and that's the danger, of course, we have to address.  I don't really know how to address it.  In 30 years, I've never had this happen.

I know you have a suggestion.  I mean, I don't want to make her explain herself.  I think that is not good posture.  That's why I cut her off from talking any more.

MR. ALLMAN:  I didn't hear her to say that they would kill her, I heard her to say it would kill her to go back in there.

THE COURT:  Oh, okay.  I took it differently.  I took it like maybe they're arguing back there, and they came to this resolution, and—but if I goes [sic] back more I may have misinterpreted that.  I understand what you're saying.

MR. AKBAR:  I think it's more than just regrets.  When she came in here she was shaking her head.  I noticed that, and that's why I asked you to poll the jury.  I think she just doesn't agree with the verdict, and she—it might have been a five to one vote, and she might have said all right.  Let's go.  I think she is a hold out.

THE COURT:  Let me have a little private consultation with my in-court judge friend, who might have some tips.  I'm very concerned about the procedure, how we proceed, because messing it up could cause a mistrial, and so I'm very concerned that whatever we do be procedurally correct.

(Brief pause)

THE COURT:  Okay.  I have an idea.  I'm not sure where to go all the way down the road, but it seems to me that the first item is to really truly understand whether she is saying these verdicts are not her individual verdicts, and just to listen to her, but outside the presence of the other jurors, so that we can get a handle on whether she's really disagreeing with the verdicts or not.

And I have to be very careful because I really don't want to pry, but I think we all have to listen and make sure we understand what she means by having reservations.  Because it can—that's way too vague.  That's not saying that's not my vote, and I have to understand whether

she is disclaiming her verdict, or whether she's just unhappy having to reach that conclusion, that she found the facts a certain way and she found the law a certain way and it fits, but she doesn't maybe agree with it, or doesn't agree with the law, and that's a different issue.

So I think I have to get a handle on what she said.  We've already discussed among ourselves, already disagreeing about what she meant and what she said, so I think we can make a better record, but the way to do that is outside the presence of the other jurors, because I think the precedent is that if she in fact is not in agreement with one of the verdicts, then the process is to send them back in to continue deliberations on that count.  That's why I went through each one, to kind of break down what were the issues.  And if I need the keep [sic] breaking that down, I will, because we just really have to be specific about it.  Not general about it.

MR. AKBAR:  Can it be a mistrial on specific counts?

THE COURT:  Absolutely.

MR. ALLMAN:  I was thinking about reading them the part of the instructions that talk about deliberations, that it has to be their individual verdict as well as the verdict of the jury as a whole, just so she's clear about what it is that—

THE COURT:  I wrote down that it only involves Counts 1, 2, 3 and 6.

MR. ALLMAN:  Right.

MR. AKBAR:  Correct.

THE COURT:  Everything is else [sic] fine.  All right.  Ask her to come in here, and we can try to iron this out.

(Whereupon, the juror entered the courtroom, and the following proceedings were had).

THE COURT:  Hi, Ms. Hall.

THE JUROR:  Hi.

THE COURT:  We want to make sure that we understand you completely, so I don't want you to feel that you're in trouble or you have done something bad or said something wrong, so please don't feel that way at all, okay?

With that being said, it is very important that when a verdict is returned that it actually be each individual juror's verdict.  So in other words, not only does everybody have to agree to the same verdict, but when you have sorted out the facts in your mind with what you believe the facts to be, and you apply them to the law, that you have that abiding conviction that if there's a guilty verdict that you have an abiding conviction of guilt on that count.

So I need to understand a little better, do you have—whether you have, as you sit here now, a question about the abiding conviction of guilt on a particular count, or whether you have maybe have a disagreement with the law so you regret or feel bad that that is the way the law is, or something that is a little different.

I'm trying to get a handle on understanding, because regret is kind of vague, and I need to know better what that means.  Can you help us?

THE JUROR:  I believe something happened that night, I truly do believe that.  However, I don't believe that it was intentionally.  You know, when you say willfully, I'm not in his head.  I don't know if he willfully did anything.  We all get angry; we all do things because of our temper.  But I know we were supposed to vote all together guilty or not guilty.

THE COURT:  Well, to have a lawful verdict returned, it does require all jurors agreeing; however, it's a two sided thing.  It means that not only all the jurors have to agree, but that has to be the conviction of each individual juror and you probably heard of a hung jury before or

something like that, where one person or more can't agree, and sometimes that happens, and there's nothing wrong with that.

It's very critical that each juror, though, sort out what they think the facts of the case are, and only you can work that out with your fellow jurors, and then you have the law, which is in writing, and apply it.  And that's all I can tell you about that.

No one is here, and I'm not here to comment on the rightness or wrongness of anything.  That's very improper for any judge to do, so that's not what we're saying.  But it is my job to be sure that these verdicts, and the way—if we're right, on Counts, 1, 2, 3 and 6 are actually your individual verdicts—

THE JUROR:  Yes.

THE COURT:  —that is critical.  And if you go back and deliberate and resolve it as to one and not another, that's fine.  That's fine.  There's nothing wrong with that.  We're not clear that you're standing by your verdict.  So in other words and the jury instructions you have them, but I think I can paraphrase this safely.  If you have a reasonable doubt about an element of any charge, then your duty is not—you have to find not guilty on that charge.  It requires that.  But only you can settle that issue, so I don't know.

THE JUROR:  The charges, I believe, are there, it's just the count I think is just so high, but I guess that's not for me to decide.  I just think this is so high for someone who had a bad night, because it can happen to anyone.  I could go home and be really angry, and I'm in the same situation.  That's my problem.

THE COURT:  Let me ask you this.  Did you or the jurors reread the instructions?

THE JUROR:   They did, but they kept saying intentionally, willfully, and then when we try to come to a decision on the lesser charge, intentionally and willfully was not there.  However, I couldn't go

with that, because the gun had been fired, so something happened. That gun had been discharged.

THE COURT:  Well, I can't do anything and help you with things that you're wrestling with about the facts.  That's you.  The law is in black and white there in those papers, and it's the whole thing.

Now, you have said a couple of things that I know in the instructions in there, there are instructions like you're to consider each count independently, so nowhere in there should you worry about as a juror whether there are too many charges made or what a sentence might be.  That's stuff is for the judge to work out.  We just need your answer on each count, whether the State has proven beyond a reasonable doubt all the elements that are on that count or that lesser.  And if it's not there, you go all the way down, from the top all the way to the bottom, and not guilty is the bottom.

MR. AKBAR:  Your Honor, can we approach?

THE COURT:  On the record or off the record?

MR. AKBAR:  On the record.

(Whereupon, the following proceedings were had at the bench).

MR. AKBAR:  I want to object, for the record.  I think this is getting to the point now to try to convince her that can [sic] change her mind, or to try to convince her.  She stated what her problems were.  I think she did say what her problems were, and the facts as relates it to the law.  It's not necessarily just reservations, so I think at this point they should just continue to go back and deliberate or call it a mistrial. I think if we keep going, she's just going to throw her hands up.

THE COURT:  Well, no.  I can reread the instruction.  She very clearly is talking about what the charges seemed to be.  She thinks it's way off base, and that's clear.  But to the extent that she starts talking about intentionally or not, only she can resolve that.  That's why I was

trying to be very clear about that.  There's two different issues going on.
I don't know.  I'm thinking bottom line just after this to just go through
each of those counts, and if it's not her individual verdict then I have to
decide whether to send them back.  I wouldn't declare a mistrial right
now.

MR. ALLMAN:  I think you have to send them back, and see if she
can resolve it.

THE COURT:  Either option I'm fine with, but I think if we keep
going she's just going to say okay, well—I don't want go on too much.
I need to understand what her— I think I have a feeling enough now that
it is a hang up on an element.  She has other stuff going on, but that's
key.  So let's send her back and see if she can resolve those in her mind.
I would accept the ones—I would accept the verdicts on the ones that she
acknowledged.

MR. ALLMAN:  Okay.

MR. AKBAR:  Okay.

(Whereupon, the conference at the bench was concluded).

THE COURT:  Okay.  What I'm going to do, after consultation
with the attorneys, on counts 5 and 4, I will accept those verdicts.  At this
time, I'm going to take 1, 2, 3 and 6, and I'm going to end up sending
them back.  I need to bring the others in to do this.

But what I want to do, because we don't want to be privy to your
jury discussions and thoughts, and that's why I cut you off.  It's not
because I don't want to hear you.  It's because it's so sacred, really, in
our system that your thought processes be your own, and we not intrude
in those in any way, and no one is trying to do that.

So just to prepare you, and I will tell the others, I think the best
procedure is to send you all back to discuss whatever reservations you
have, and if you're able to resolve them, fine.  If you are not able to, fine.

That's—only the jurors can do that, and each juror individually can do that. So I will be—

THE JUROR:  Your Honor, can I say something?  It would be a total waste.  I mean, they're truly convinced in what they were [sic]. When I went back there, they were all over me.  They're totally convinced with it.  You know, it's just me, you know, holding out or whatever.  So they're convinced with it.  I mean, we can do this at 6:15, 7:15, 8:15.  It's going to be the same.

THE COURT:  Okay.

THE JUROR:  I don't want to waste your time or anyone's time. You just asked me what my opinion was, and I said guilty with regrets. I'm just sorry for this young man.  That's all I can say.

THE COURT:  Well, let me talk to the attorneys again, real quick. Side bar.

(Whereupon, the following proceedings were had at the bench).

THE COURT:  Well, help.

MR. AKBAR:  I think we can give the instruction to the jury regarding the hold out.

THE COURT:  Well, I can take the two verdicts and declare a mistrial as to the rest.

MR. ALLMAN:  I don't know that that's what she's asking you to do, though.

THE COURT:  She's saying it won't make any difference, because she's not going the change their minds, and she's implying they won't change hers.

MR. ALLMAN:  We still don't really know what her mind is.

THE COURT:  I know.

MR. AKBAR:  I think she said it's on the elements.

THE COURT:  I kind of agree with Akbar.  You can only go forward, and at some point you have to say if you can't get the right answer, guess what?  The bottom line is there's not a unanimous verdict.

MR. ALLMAN:  Right, but I don't think we're there yet.  I think they need to go back and tell us that they're hung on those other counts or find him not guilty or find him guilty of something or lesser.  I think they have to go back in there.  She's not wasting our time.  That's my suggestion.  Bring them in, say it appears that there's not a unanimous verdict, nothing more than that, and send them back in.

THE COURT:  I can do the <u>Allen</u> charge.

MR. AKBAR:  That's what I would suggest.

THE COURT:  It's so minor.  It's more like a "please" charge.  Okay.

(Whereupon, the conference at the bench was concluded).

THE COURT:  All right.  I what [sic] number is that?

MR. ALLMAN:  I'm looking now.  4.1, I believe.  Yes, 4.1.

THE COURT:  Okay.  What we're going to do is give it a try, so bear with us.  I have a special instruction, and I will ask you and the other jurors to listen to it.  Okay?  So bring in the other jurors.

(Whereupon, the jury entered the courtroom, and the following proceedings were had)

THE COURT:  Ladies and gentlemen of the jury, I have decided at this point that there is not a clear unanimous verdict on Counts 1, 2, 3

and 6.  There is a special jury instruction I want to read, and then send you back for this.  I think it is self explanatory.

I know that all of you have worked hard to try to find a verdict in this case.  It apparently has been impossible for you to so far.  Sometimes an early vote before discussion can make it hard to reach an agreement about the case later.  The vote, not the discussion, might make it hard to see all sides of the case.

We are all aware that it is legally permissible for a jury to disagree. There are two things a jury can lawfully do:  Agree on a verdict or disagree on what the facts of the case may truly be.  There is nothing to disagree about on the law.  The law is as I told you.  If you have any disagreement about the law, I should clear them for you now. That should be my problem, not yours.

If you disagree over what you believe the evidence showed, then only you can resolve that conflict, if it is to be revolved.

I have only one request of you.  By law I cannot demand this of you.  But I want you to go back into the jury room, then, taking turns, tell each of the other jurors about any weakness of your own position. You should not interrupt each other or comment on each other's views until each of you has had a chance to talk.

After you have done that, if you simply cannot reach a verdict, then return to the courtroom and I will declare these counts or counts mistried, and will discharge you with my sincere appreciation for your services.

You may now retire to continue with your deliberations.

. . . .

Let me send you back, and we'll get those clean verdict forms. And we need the jury instructions, written jury instructions.  We'll just leave the evidence here.  If you want to see pictures or evidence, just let us know.  There's nothing wrong with it, but if you don't need it, that's fine, too.

(Whereupon, the jury again retired to deliberate its verdict).

THE COURT:  Counts 4 and 5 are accepted.  Those can be filed.
Now, on these verdicts I want them especially marked, because there
could be confusion.  I will write on them "not accepted" in big letters,
and initial it, so they won't get mixed up with anything else in the file.

(Recess taken).

THE COURT:  Do the Jurors indicate they have a verdict as to the
other counts?

THE BAILIFF:  Yes.

THE COURT:  Okay.  Bring them in.

(Whereupon, the jury returned to the courtroom, and the following
proceedings were had).

THE COURT:  All right.  Have you reached a verdict as to the
remaining counts?

THE FOREPERSON:  Yes.

(Ex. V at 219–38).  The court announced the verdicts of guilty as charged on Counts

I, II, and III, and guilty of a lesser included offense on Count VI (*id.* at 239–40).  The

jury was polled, and each juror unequivocally stated his or her agreement with the

verdicts (*id.* at 240–41).  The court accepted the verdicts (*id.* at 241).

      1.     IATC Claim

           a.     Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of Strickland is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms.  Strickland, 466 U.S. at 688–89, 691.  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689.  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ."  Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).  Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also

constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'"  *Id.* (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do.'" Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so."  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high.  *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002).  To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Jones v. GDCP Warden, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting Strickland, 466 U.S. at 694).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome

of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. Williamson v. Fla. Dep't of Corr., 805 F.3d 1009, 1016 (11th Cir. 2015) (citing Richter, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncrasies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 694–95. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal. *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of Strickland was

unreasonable under § 2254(d) is all the more difficult." <u>Richter</u>, 131 S. Ct. at 788.  As

the <u>Richter</u> Court explained:

> The standards created by <u>Strickland</u> and § 2254(d) are both "highly
> deferential," and when the two apply in tandem, review is "doubly" so.
> The <u>Strickland</u> standard is a general one, so the range of reasonable
> applications is substantial.  Federal habeas courts must guard against the
> danger of equating unreasonableness under <u>Strickland</u> with
> unreasonableness under § 2254(d). When § 2254(d) applies, the question
> is not whether counsel's actions were reasonable.  The question is
> whether there is any reasonable argument that counsel satisfied
> <u>Strickland</u>'s deferential standard.

*Id.* (citations omitted).

### b.    Federal Review of State Court Decision

As Ground 1 of Petitioner's amended Rule 3.850 motion, Petitioner presented

all of the sub-claims of IATC that he presents in the instant § 2254 petition (Ex. F at

35–43).  The state circuit court summarily rejected this claim (Ex. G at 207–11).  In the

state circuit court's written decision denying the claim, the court correctly stated the

deficient performance and prejudice prongs of the <u>Strickland</u> standard as the

applicable legal standard (*id.* at 211).  The court adjudicated the claim as follows:

> The trial transcript demonstrates conclusively that as to this issue,
> Mr. Ferrell can establish neither deficient performance nor prejudice.
>
> First, the issue was recognized, fully discussed and explored by all
> counsel.  The Court's own statement [i.e., "I'm thinking bottom line just
> after this to just go through each of those counts, and if it's not her
> individual verdict then I have to decide whether to send them back.  I

wouldn't declare a mistrial right now" (*see* Ex. G at 208)] demonstrates that the Court concluded that defense counsel objected and moved for a mistrial.  Ultimately, the court was persuaded that a mistrial was not appropriate.

Second, a mistrial was not appropriate.  The juror made equivocal and contradictory statements concerning the verdict.  She expressed sympathy for the defendant, concerns about the legal definitions in the jury instructions, concerns about proof of state of mind, and concerns about how she might have behaved in similar circumstances.  There is no simple answer and the transcript amply reflects a good faith effort to respond appropriately to difficult legal circumstances.  The courts are not required to and cannot conduct perfect trials.  Criticizing defense counsel's effort in these circumstances is the height of strategic hindsight.  The jury prematurely reported unanimity and the court carefully considered and addressed the issues raised without intruding on the jury's responsibilities.

Third, the issue is patent from the record.  It could have and should have been raised on appeal.  Rule 3 .850 is not a mechanism for relitigating obvious issues.

Finally, there was no basis to object to the court's handling of these idiosyncratic, ambiguous circumstances. The court made absolutely plain that it imposed no time limit on deliberations, did not prefer one verdict over, another, did not require a decision and did not pressure the jurors in any way.  The <u>Allen</u> charge was not modified.  <u>See</u>, <u>Davis v. State</u>, 832 So. 2d 239 (Fla. 5th DCA 2002); <u>Holmes v. State</u>, 710 So. 2d 188, 191 (Fla. 1st DCA 1998); <u>Warren v. State</u>, 498 So. 2d 472 (Fla. 3d DCA 1986).  Even assuming that defense trial counsel might have somehow said something different, the court's decision was correct and well within the exercise of appropriate discretion.  Thus, Mr. Ferrell can demonstrate neither deficient performance nor prejudice as to Issue 1.

(Ex. G at 210–11).  The First DCA affirmed the decision without written opinion (Ex.

M).

The reasonableness of Attorney Akbar's performance turns on whether there was a legal basis, under federal or state law, for a motion for mistrial. The undersigned recognizes that some of the cases discussed below are not controlling in the circumstances of this case, but the court includes them because either Petitioner relied upon them or they are instructive on the issue of jury polling.

In Brasfield v. United States, 272 U.S. 448, 47 S. Ct. 135, 71 L. Ed. 345 (1926), the trial court inquired, after jury deliberations stalled, as to how the jury was divided, and was informed simply that the jury stood nine to three. The jury resumed deliberations and subsequently found the defendants guilty. The Supreme Court concluded that the inquiry into the jury's numerical division during deliberations necessitated reversal because it was generally coercive and almost always brought to bear "in some degree, serious although not measurable, an improper influence upon the jury." 272 U.S. at 450 (emphasis added).

In Lowenfield v. Phelps, 484 U.S. 231, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988), a federal habeas case, the Supreme Court addressed whether polling a deadlocked jury during a single-count trial, and reading a slightly modified Allen[3] charge was

---

[3] In Allen v. United States, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896), the Supreme Court held that it was not error to instruct the jury, on their return for further instruction, in substance:

> that in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere

unconstitutionally coercive.  484 U.S. at 237–41.  During deliberations in the penalty

phase (Lowenfield was a capital case), the jury sent the court a note stating that the jury

was unable to reach a decision and requesting that the court again advise the jury as

to its responsibilities.  *Id.* at 234.  The jury was called back.  *Id.*  The court provided

a piece of paper to each juror and asked each to write on the paper his or her name and

the answer to the question whether "further deliberations would be helpful in obtaining

a verdict."  *Id.*  The jurors complied, and were asked to retire to the jury room.  *Id.*

The papers revealed eight answers in the affirmative—that more deliberation would

be helpful—and four in the negative.  *Id.*  Defense counsel renewed a previously made

motion for a mistrial, arguing that the jury was obviously hung.  *Id.*  The trial court

denied the motion, noting that this was the first sign that the jury was having trouble

---

acquiescence in the conclusion of his fellows, yet they should examine the question
submitted with candor, and with a proper regard and deference to the opinions of each
other; that it was their duty to decide the case if they could conscientiously do so; that
they should listen, with a disposition to be convinced, to each other's arguments; that,
if much the larger number were for conviction, a dissenting juror should consider
whether his doubt was a reasonable one which made no impression upon the minds of
so many men, equally honest, equally intelligent with himself. If, upon the other hand,
the majority were for acquittal, the minority ought to ask themselves whether they
might not reasonably doubt the correctness of a judgment which was not concurred in
by the majority.

164 U.S. at 501.  This has become known as a "traditional Allen charge."  *See* Lowenfield, 484 U.S.
at 238.

reaching a verdict in the penalty phase.  *Id.*  The court directed that as previously agreed upon the jury would return to the courtroom and be instructed again as to its obligations in reaching a verdict.  *Id.*

When the jurors returned to the courtroom a new note from them was given to the judge.  484 U.S. at 234.  This note stated that some of the jurors had misunderstood the question previously asked.  *Id.*  The judge polled the jury again using the same method but changing the question slightly; the judge asked, "Do you feel that any further deliberations will enable you to arrive at a verdict?"  *Id.*  This time 11 jurors answered in the affirmative and 1 in the negative.  *Id.* at 234–35.  The court then reinstructed the jury:

> Ladies and Gentlemen, as I instructed you earlier if the jury is unable to unanimously agree on a recommendation the Court shall impose the sentence of Life Imprisonment without benefit of Probation, Parole, or Suspension of Sentence.
>
> When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.
>
> Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors.  You are not advocates for one side or the other.  Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

484 U.S. at 235.  Defense counsel did not object to either poll, to the manner in which the polls were conducted, or to the supplemental instruction.  *Id.*  The jury resumed its deliberations and in 30 minutes returned with a verdict sentencing the petitioner to death on all three counts of first-degree murder.  *Id.*

The Supreme Court began its analysis by rejecting the petitioner's reliance upon Brasfield.  484 U.S. at 239–40.  The Court noted that the decision in Brasfield was an exercise of the Supreme Court's supervisory powers over the federal courts, and made no mention of the Due Process Clause or any other constitutional provision.  *Id.*  Additionally, the Supreme Court distinguished the facts from Brasfield because, unlike Brasfield, the trial court's inquiry as to the numerical division of the jury was not as to how they stood on the merits of the verdict during deliberations, but how they stood on the question of whether further deliberations might assist them in returning a verdict.  *Id.* at 240.  The Court also noted that the fact that defense counsel did not object to either the polls or the supplemental instruction indicated that the potential for coercion argued on appeal "was not apparent to one on the spot."  *Id.*  The Court held, "on these facts the combination of the polling of the jury and the supplemental instruction was not 'coercive' in such a way as to deny petitioner any constitutional right."  *Id.* at 241.  The Court clarified, however, that "by so holding we do not mean

to be understood as saying other combinations of supplemental charges and polling might not require a different conclusion." *Id.*

In United States v. Sexton, 456 F.2d 961 (5th Cir. 1972),  one juror responded to the post-verdict poll by stating, "I didn't vote either way."  The trial court then inquired "Well, is it your verdict?", to which the juror replied, "Yes, sir."  The court ordered the jury to retire for further deliberations, after which another poll showed that the verdict was unanimous.  The court held that the trial court abused its discretion under Rule 31(d) of the Federal Rules of Criminal Procedure, because the juror, in effect, voted in the courtroom instead of the jury room, and she voted under the compulsion of the court.  456 F.2d at 963.

Rule 31(d) provides:

> **(d) Poll of Jury.**  When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion.  If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.

Fed. R. Crim. P. 31(d).  The Eleventh Circuit instructed that the safe procedure for conducting a jury poll free of coercion, pursuant to Rule 31(d), was the following:

> There can be no question of the right of a juror, when polled, to dissent from a verdict to which he has agreed in the jury room, and when that happens, the jury should either be discharged or returned to their room for further deliberation.  It is both unwise and undesirable that the Court should enter into an argument with the juror or require an explanation of his change of position. . . .  The correct practice, when a poll of the jury

> is asked, is for the clerk to call the roll and ask each juror as his name is
> called to answer . . . and if the responses of the individual jurors are not
> in complete agreement, the jury should be required to retire and give
> further consideration.

456 F.2d at 966–67 (citation omitted).  The court noted that if the trial court had simply

stated that the verdict could not be accepted and returned the jury for further

deliberation, there would have been no error.  *Id.* at 967.

In United States v. Edwards, 469 F.2d 1362 (5th Cir. 1972), which involved a

multiple-count trial, the defendants requested a poll after the foreman announced the

verdict of the jury.  *Id.* at 1366.  When the poll reached the eighth juror the following

ensued:

> THE COURT:  Is this your verdict?
>
> MRS. ARACELI VALLEJO:  It's my verdict, but I am still in
> doubt.
>
> THE COURT:  All right, it's your verdict . . . [proceeding with the
> poll]

469 F.2d at 1366.  Upon completion of the poll, defense counsel moved for a mistrial

or, in the alternative, that the jury be directed to retire for further deliberations.  *Id.*

The Court then questioned Mrs. Vallejo as follows:

> THE COURT:  The juror stated that this is her verdict.  Is that what
> you said?
>
> MRS. VALLEJO:  Yes, sir.

THE COURT:  All right.

MR. BRYAN [defense counsel]:  Your Honor, I believe she said it was her verdict but she was still in doubt.

THE COURT:  She has said that this is her verdict.  Is that correct?

MRS. VALLEJO:  Yes, sir.

THE COURT:  All right.  The verdict will be received.

469 F.2d at 1366.  The court found that the court's polling procedure was "more coercive" than the procedure in Sexton, because the trial judge not only extracted a vote from a juror in open court, he also refused to order further deliberations before receiving the final verdict.  *Id.* at 1368.

In Sincox v. United States, 571 F.2d 876 (5th Cir. 1978), a juror responded to a poll of the published verdict, "Yes.  With a reasonable doubt."  The trial court then polled the remaining jurors and accepted a verdict of guilty.  The court held that this violated the defendant's "fundamental right guaranteed by the Sixth Amendment that if convicted at all it would be a valid, unanimous jury verdict of guilt."  *Id.* at 878.  Citing Rule 31(d) of the Federal Rules of Criminal Procedure, the court concluded, "When Juror Lewis was polled and stated that he had a reasonable doubt the trial judge had the duty either to order the jury to return for further deliberations or to dismiss

them.  Absent exceptional circumstances, not here applicable, there was no third option." *Id.*

In United States v. Spitz, 696 F.2d 916 (11th Cir. 1983), which involved a single-count trial, the jury informed the court that it had reached a verdict, returned to the courtroom, and a guilty verdict was returned.  *Id.* at 917.  At the defendant's request the jurors were polled in the numerical order of their seating.  *Id.*  The first seven jurors assented to the verdict.  *Id.*  Thereafter the following occurred:

> The Clerk:  Roberta A. McNeil, is the verdict as published as to Peter Spitz your verdict?
>
> Juror:  No.
>
> The Court:  Well, let's poll the remainder of the jury, please, and come back.

696 F.2d at 917.  The remaining four jurors assented to the verdict.  *Id.*  The court continued:

> The Court:  All right.  You may be seated, ladies and gentlemen. Roberta McNeil, would you please stand.  You have indicated that this is not your verdict, is that correct?
>
> Juror:  Yes, sir.
>
> The Court:  All right.  Now ladies and gentlemen of the jury . . .

696 F.2d at 917.  The court then proceeded to give the "approved" <u>Allen</u> charge, during which he told Mrs. McNeil that she could sit down.  *Id.*  The jury then retired and returned a half hour later with a unanimous guilty verdict.

The Eleventh Circuit concluded that the effect the trial court's continuing the poll "for no reason at all," since it was clear there was not unanimous concurrence in the verdict, was to establish how the jury stood numerically, and could have been perceived as attempted coercion of Juror McNeil.  696 F.2d at 917–18.  The court held that under Rule 31(d), the trial court had only two options after Juror McNeil stated that the published verdict was not her verdict—either order the jury to return for further deliberations or dismiss them—and the court's electing a third option by continuing the polling was per se error.  *Id.* (citing <u>Brasfield</u>, 272 U.S. 448).

In <u>Watson v. State of Ala.</u>, 841 F.2d 1074 (11th Cir. 1988), a federal habeas case, the petitioner claimed that the trial court unconstitutionally coerced the jury to reach a unanimous verdict.  After the jury deliberated for an hour and thirty-five minutes, they returned with a guilty verdict.  *Id.* at 1075.  At defense counsel's request the judge polled each of the twelve jurors to determine whether the verdict was unanimous.  *Id.* The following colloquy then occurred:

> Defense counsel:  Judge, there are two ladies that I'm not sure of.

The Court:  I have polled the jury.  Now, is this your verdict?  If it's not your verdict, I need to know.  Is this your verdict?

Defense counsel:  Go ahead and answer.

Forewoman:  Well, it was—

The Court:  I want to know.  Is this your verdict?

Forewoman:  Well, may I speak to the Court?

The Court:  Let me explain.  A verdict must be unanimous.

Forewoman:  Well, it is not unanimous.

The Court:  All right.  You must retire and begin your deliberations anew and arrive at a unanimous verdict.

Forewoman:  That was the question.  I told them in the beginning it must be unanimous.

The Court:  Yes, it must be unanimous.  I ask that you go back to the jury room and continue your deliberations until you arrive at a unanimous verdict.

I841 F.2d at 1075.  The jury retired to resume deliberations, and fifteen minutes later, returned with a unanimous guilty verdict.  *Id.*  The Eleventh Circuit noted that the applicable standard was whether under the totality of the circumstances the trial judge's instruction to the jury was coercive.  *Id.* at 1076 (citations omitted).  Viewing the supplemental instruction under the totality of the circumstances, the court found that

it was not coercive, thus, there was no violation of the petitioner's constitutional rights. *Id.* at 1076–77.

In Scruggs v. Williams, 903 F.2d 1430 (11th Cir. 1990), a federal habeas case, the district court granted habeas relief on Scruggs' claim that the state trial court's questioning of jurors during the post-verdict jury poll denied his Fourteenth Amendment right to due process. *Id.* at 1431. The State appealed, and the Eleventh Circuit reversed the district court's decision. *Id.* at 1432. The questioning at issue was the following:

> THE COURT:  Call the jurors' names, please.  When your name is called I will ask you a couple of questions.
>
> THE CLERK:  Julia B. Leverett.
>
> THE COURT:  Was that your verdict?
>
> JUROR LEVERETT:  Beg your pardon.
>
> THE COURT:  Was that your verdict that the jury returned in this case?
>
> JUROR LEVERETT:  No sir.
>
> THE COURT:  That was not your verdict?
>
> JUROR LEVERETT:  No sir.
>
> THE COURT:  All right.  Call the next juror.
> . . . .
> THE CLERK:  Lillie Bell Beard.

THE COURT:  Was that your verdict?

JUROR BEARD:  It was my verdict, but I had some doubts.

THE COURT:  Was it your verdict or not?

JUROR BEARD:  I voted yes.

THE COURT:  Was it freely and voluntarily entered into by you?

JUROR BEARD:  It was free and voluntary, but I still had some doubts.

THE COURT:  In other words, you're saying that was not your verdict?

JUROR BEARD:  Well, I went by the evidence, but I'm not sure, you know.  The only thing I could go by was the evidence, but I'm not sure if the evidence was right.  But, I mean, that's what I went by.

THE COURT:  Well, is that still your verdict?

JUROR BEARD:  Yes, I voted.

THE COURT:  And you knew what you were doing?

JUROR BEARD:  I knew what I was doing, but in my heart I really had some doubts.

THE COURT:  Well, you could have some doubts and still—in other words, there is nothing in the law that says beyond all doubt.  It was what was referred to in the Charge as reasonable doubt.  So if that is your verdict . . .

JUROR BEARD:  Yes.

THE COURT:  Call the next juror, please.

903 F.2d at 1432–33.  The next five jurors were polled without incident.  *Id.* at 1433.

The eighth juror, however, also expressed doubt:

> THE CLERK:  Patricia A. Mayo.
>
> THE COURT:  Was that your verdict?
>
> JUROR MAYO:  Yes.
>
> THE COURT:  Was it freely and voluntarily entered into by you?
>
> JUROR MAYO:  With doubt, but freely and voluntarily.
>
> THE COURT:  Is it still your verdict?
>
> JUROR MAYO:  Yes.

903 F.2d at 1433.  The remaining four jurors acknowledged the verdict as their own

without comment.  *Id.*  At the end of the poll, the court returned to the first juror:

> THE COURT:  Call the first juror.
>
> THE CLERK:  Julia B. Leverett.
>
> THE COURT: You raised your hand a minute ago, when I was questioning one of the other jurors.  Did you understand the question that I propounded to you originally?
>
> JUROR LEVERETT:  No sir, I'm sorry I didn't understand you.
>
> THE COURT:  I will go over it again.  Was that your verdict?
>
> JUROR LEVERETT:  Yes.
>
> THE COURT:  Was it freely and voluntarily entered into by you?

> JUROR LEVERETT:  Yes sir.
>
> THE COURT:  Is it still your verdict?
>
> JUROR LEVERETT:  Yes sir.

903 F.2d at 1433.  Counsel for Scruggs moved for a mistrial.  *Id.*  The trial court denied the motion, noting that the jury had continued to stand by its verdict and that "reasonable doubt does not mean all doubt."

In analyzing the district court's grant of habeas relief, the Eleventh Circuit first determined that the district court erred by relying upon Edwards and Sexton to determine the federal constitutional issue of the propriety of the jury poll, since both of those cases applied interpretations of the Federal Rules of Criminal Procedure, which did not apply in state courts.[4]  903 F.2d at 1433–34.

The Eleventh Circuit then considered whether the trial court's questioning was sufficiently coercive to violate due process.  903 F.2d at 1435.  The court began by distinguishing pre-verdict questioning of jurors from post-verdict questioning:

> A trial judge's efforts to coerce reluctant jurors into delivering a verdict may sufficiently invade the province of the jury so as to deny the defendant fundamental fairness.  Here, however, the trial judge did not speak to the jurors until after they had reached a verdict through private

---

[4] The court acknowledged that the reference in Edwards to due process was inadvertent, and upon reading Edwards and Sexton as a whole, it was clear that both cases were decided under Rule 31(d).  *See*  Scruggs, 903 F.2d at 1434.

deliberations.  All twelve jurors voted for conviction during those deliberations, as the jury poll clearly indicates.  Scruggs does not argue, and the record does not suggest, that any juror was coerced in the jury room or even was coerced into acknowledging that she had previously voted to convict.

Instead, Scruggs contends that during the poll the trial judge coerced jurors Beard and Mayo into reaffirming their votes after they had expressed doubts.

*Id.* at 1435.  The Eleventh Circuit concluded that even assuming that coercion at the post-verdict stage in proceedings could render the trial fundamentally unfair, the judge's questioning in Scruggs' case was not sufficiently coercive to violate due process.  *Id.*

The rules governing verdicts in criminal cases in Florida are Rule 3.440 and 3.450 of the Florida Rules of Criminal Procedure.  Rule 3.440 provides:

When the jurors have agreed upon a verdict they shall be conducted into the courtroom by the officer having them in charge.  The court shall ask the foreperson if an agreement has been reached on a verdict.  If the foreperson answers in the affirmative, the judge shall call on the foreperson to deliver the verdict in writing to the clerk.  The court may then examine the verdict and correct it as to matters of form with the unanimous consent of the jurors.  The clerk shall then read the verdict to the jurors and, unless disagreement is expressed by one or more of them or the jury is polled, the verdict shall be entered of record, and the jurors discharged from the cause.  No verdict may be rendered unless all of the trial jurors concur in it.

Fla. R. Crim. P. 3.440.

Rule 3.450 provides:

> On the motion of either the state or the defendant or on its own motion, the court shall cause the jurors to be asked severally if the verdict rendered is their verdict.  If a juror dissents, the court must direct that the jury be sent back for further consideration.  If there is no dissent the verdict shall be entered of record and the jurors discharged.

Fla. R. Crim. P. 3.450.  Unlike the federal rule, the Florida rule does not give the trial court the option of discharging the jury if a juror dissents.

In Cogmon v. State, 338 So. 2d 562 (Fla. 1st DCA 1976), after the jury deliberated for one and one-half hours, the court called it back and gave it an Allen charge.  *Id.* at 563.  Forty-five minutes later, the jury returned with verdicts of guilty to both charges.    *Id.*  The defense requested that the jury be polled and the clerk proceeded to do so.  *Id.*  When the clerk came to Juror Searcy, the transcript of the trial shows the following:

> MRS. CLERK:  Mrs. Searcy, was that your verdict of guilty on both counts?
>
> JUROR SEARCY:  (Shakes head negatively.)  It wouldn't agree with my conclusions, no.
>
> THE COURT:  I didn't hear that.
>
> JUROR SEARCY:  I said that I turned in a guilty plea, but it wouldn't agree with my conclusions if I got up and said that it was.
>
> THE COURT: But that is the verdict you reached in the jury room?
>
> JUROR SEARCY:  Yes.

THE COURT:  And that's the verdict that has just been read here?

JUROR SEARCY:  Yes.

THE COURT:  Mrs. Searcy?

JUROR SEARCY:  Yes, sir.

THE COURT:  Did I correctly understand you to say that arriving at this verdict or reaching this verdict you did bothers your conscience?

JUROR SEARCY:  Yes, sir.

THE COURT:  But that you still felt that was the verdict to be reached with the other members of the jury?

JUROR SEARCY:  I felt like this.  If the majority, five of them, would say he was guilty that there was no alternative.

THE COURT:  But that you independently arrived at that verdict along with the other five members of the jury.  Is that correct?

JUROR SEARCY:  Well, at the end, yes, I did.

338 So. 2d at 563.  Apparently the trial court entered a guilty verdict and discharged the juror.  *See id.*  The First DCA held, "having dissented from the verdict and there having been no subsequent unanimous verdict, a mistrial should have been declared." *Id.* (citing Fla. R. Crim. P. 3.450).

In Rodriguez v. State, 462 So. 2d 1175 (Fla. 3d DCA 1985), the Third DCA held that the trial court deprived the defendant of an impartial jury, in violation of his

federal and state constitutional rights, when it gave a supplemental charge to the jury

after several hours of deliberations without a verdict:

> Ladies and gentlemen of the jury I want you to listen very carefully and listen to what I say and clear your minds at this moment.
>
> I want you to know that everything that you are doing right now is appreciated and don't think that it is not.  I am not trying to cite you.  I just want you to know we have all been through a lot together, all of us. We haven't been through what you are going through, but that is not our function.  We all appreciate it.
>
> Your job is twofold in this case.  The first aspect of this case is to listen and ladies and gentlemen I can't ask for any more than that, what you have done, but the second aspect is the critical aspect and that is for you people to reach a verdict.
>
> Two things have been asked, one has been performed thus far.  Then we know what you're going through.  We do appreciate it.  I want you to understand.  I want to stress that everybody in this courtroom we've been together a rather long time now.   What this involves, ladies and gentlemen, is a melting of divergent backgrounds and personalities into one decision.  It sounds simple, it's not but that is what it is.  You must bring yourselves together to reach a verdict, ladies and gentlemen, not to fragment and split apart, because ultimately what it comes out is 12 heads into one, 12 mouths into one to speak that verdict that we are all looking for.  I hope you all realize that, ladies and gentlemen.
>
> I did some computation that are [sic] absolutely staggering on this matter. To me it is staggering.  We have in excess of 62 hours.  My computation is 62 hours of trial time involved here.  Now I am counting two alternate jurors that we dismissed and I am taking 12 of you and I am multiplying that 62 hours.  I come out with 724.  Let's call it man hours that you people have invested in this trial.  Then you take myself, the judge, with my secretary two hours and the attorneys, the translators, the court clerk, the court reporter, everybody involved in this trial.  We are over—well

over a thousand hours here in this trial invested.  Your particular hours invested in this matter will amount to 40 hour week.  If you're talking a great sum two months of working that's what we have invested in this trial.

Ladies and gentlemen, last night there was a message that we were a hung jury.  I never had a hung jury and I don't want to accept that aspect.  So I allow that out to you now so that you will understand that I know that you people can reach a verdict.  Now I am going to give you a personal philosophy.  I sat as judge in County Court and I have been in the Circuit Court as judge.  I have handled and made decisions in well over 30,000 cases.  That is a lot of work, ladies and gentlemen.  A lot of decisions that I made I've gone home and I've gone to sleep and I have gotten up the next day feeling good about my past and continuing on with making these decisions.

Ladies and gentlemen you can make a decision in this case.  I know that you can do it, because regardless of everything that took place before and everything that is going to take place when you go back into that room at this trial, ladies and gentlemen, is you.  It's nothing else.  It is out of our hands.  It is out of our control and it only amounts to you people melting your minds and personalities into one to reach a verdict. I have faith in you, ladies and gentlemen.  I know you can do it. It was never promised it would be an easy road.  You know what we went through before the trial was over in presentation.

Ladies and gentlemen you have so much invested in this.  I have so much invested in this.  We all have so much invested in this.  We can't do without you.  I can't put it in any clearer way, any better way, but I do know that a verdict can be reached.  There are trials that go on all day long, you're not involved.  They do happen everything is important, but ladies and gentlemen the most important aspect right now at this time is you to set aside egos and personalities that are separating and melt them together into one cozy-together unite.  I hope that I am clear.

Bill, if you will take them back into the jury room, please.

Please try if possible to deliberate a little harder, I guess.  Thank you all very much.

462 So. 2d at 1175–76.  The Third DCA held that the "particular vices of the charge" were (1) it tainted the jurors' decision-making process by exhorting them, as good citizens, to consider such extraneous and improper factors as the government's fiscal health in arriving at a decision, and (2) it instructed the jurors that they must reach a verdict.  *Id.* at 1177–78.  The conviction was thus reversed and the case remanded for a new trial.  *Id.* at 1178.

In Webb v. State, 519 So. 2d 748 (Fla. 4th DCA 1988), the following colloquy occurred between the trial court and a juror after five hours of deliberation:

MR. WEINBERG:  May I ask a question, Your Honor?

THE COURT:  Sure.

MR. WEINBERG:  If one juror is not able to render a decision at all, whether it be whatever it is, and the other jurors can, does that mean we cannot make a unanimous decision?

THE COURT: It must be unanimous.

MR. WEINBERG:  It does not involve an alternate?

THE COURT:  The alternate is not for this purpose.

MR. WEINBERG:  We've gone through each one's testimony and it seems that one juror cannot make a decision.  I think it's too much of an emotional and heavy burden to make a decision of this degree.  It's

> possible, after some food and rest, it could be different.  This is a very
> serious case and we want to give it the most attention it can get.

519 So. 2d at 749.  The Fourth DCA held that it was fundamental error to instruct the

jury that the verdict must be unanimous, and to impose a time restriction on

deliberations.  *Id.*

In Gahley v. State, 567 So. 2d 456 (Fla. 1st DCA 1990), the First DCA

considered whether the trial court's supplemental instruction, even though the jury had

not announced a deadlock, was coercive.  After nearly three hours of deliberation, the

jury was returned to the courtroom, where the trial court inquired into their progress.

567 So. 2d at 458.  Upon being advised that there were a couple of questions which the

jurors considered important, the trial court stated:

> [W]e're not here to comment on the evidence in the case.  If you feel any
> additional amount of time certainly would assist you, of course, feel free
> to do so.  If not, then you need to relate that to the court and the court
> will have to consider that and decide as to whether or not we need to
> proceed in the case.
>
> Let me read you one additional instruction which might assist you and
> then I'm going to ask that you go back and let me know within just a few
> minutes as to whether or not you feel that—after hearing this additional
> instruction, whether or not you feel you can fulfill your responsibility in
> this case.

567 So. 2d at 458.  The trial court then gave the Florida standard jury deadlock instruction.[5]  *Id.*  Twelve minutes later, the jury returned a guilty verdict.  *Id.*

The First DCA concluded that the supplemental charge was not coercive when it is considered in proper context.  567 So. 2d at 460.  The court noted that the trial court did not restrict the jury's deliberation by an arbitrary deadline, nor did the court require that the jury reach a verdict.  *Id.*  The court held that since the jury had not completed its work at the usual adjournment time, it was not inappropriate to return the jurors to the courtroom to provide guidance.  *Id.*

In Gonzalez v. State, 627 So. 2d 63 (Fla. 2d DCA 1993), which involved a multiple-count trial, the jury was polled after the guilty verdict was read.  *Id.* at 63.  The following exchange took place between the trial court and juror number one, Juror Slaughter:

> THE COURT:  Ms. Slaughter, is this your verdict and the verdict of the jury as a whole?
>
> (No response.)
>
> THE COURT:  This verdict she read, is that your verdict?
>
> MS. SLAUGHTER:  My verdict?

---

[5] The supplemental instruction was the same instruction given in Petitioner's case.

THE COURT: Yes.  Is the verdict that she read, is that your verdict and the verdict of the jury as a whole?

MS. SLAUGHTER:  I guess so.

THE COURT:  Is that how you voted?  Is that what you wanted to do?

MS. SLAUGHTER:  Well, for one of them.

627 So. 2d at 63.  At that point, the trial court made no further inquiry and went on to poll the remaining jurors, who were all in agreement with the verdict.  *Id.*  After polling the remaining jurors, the trial court returned to Juror Slaughter:

MS. SLAUGHTER:  Your Honor, I didn't understand, is that a verdict as a whole.  I never . . . .

THE COURT:  My question is, is that your decision?

MS. SLAUGHTER:  Yes, sir.  I didn't understand what you were saying about this verdict as a whole, because I never . . . .

THE COURT:  Okay.  Yours and what you understand the rest of the jury voted?

MS. SLAUGHTER:  Right.

627 So. 2d at 63–64.  The Second DCA noted that Juror Slaughter did not express her dissent as strongly as the juror in Cogmon; however, she clearly indicated that her verdict did not apply to one of the defendants.  *Id.* at 64.  The Second DCA held that at that point, the court should have returned the jury for further deliberation, or it

should have inquired further as to what Juror Slaughter meant by the statement, "[w]ell [that is what I wanted to do] for one of them." The Second DCA noted that the trial court's polling of the rest of the jurors could be perceived as attempted coercion of Juror Slaughter, and that rather than asking her to explain herself, the trial court appeared to "cut her off," not allowing her to finish what she was trying to say. *Id.* The Second DCA held that the trial court erred in accepting the jury's verdict "in the manner described," and that the proper procedure for the trial court to follow was either to return the jury for further deliberation or to inquire as to the meaning of the ambiguous statement made by the juror. *Id.*

In Brutton v. State, 632 So. 2d 1080 (Fla. 4th DCA 1994), which involved a single-count trial against two defendants, the Fourth DCA held that the trial court committed reversible error when, once a juror repudiated her verdict during polling by stating that the guilty verdict was not her verdict, the court continued to poll the jurors, interrogated the foreman on what occurred in jury room, and then examined the dissenting juror, in front of the other jurors, on her reason for disagreeing with the verdict. *Id.* at 1082. The specific facts were the following. Once the jury returned a guilty verdict against both defendants, the defense requested polling of the jury. 632 So. 2d at 1080. *Id.* Each of the first four jurors indicated the verdict was his or her verdict. *Id*. When the clerk reached juror number five, the juror stated:

JUROR:  I don't agree with it, no.  I'm sorry.  I please, can I just get off this.

THE COURT:  No, you can't at this point in time.

632 So. 2d at 1080.  The clerk continued to poll the jury, with juror number six indicating his assent to the verdict.  *Id.*  In the jury's presence, the court asked the foreman whether the verdict had been unanimous when signed in the jury room.  *Id.* The foreman advised the court that the verdict had been unanimous.  *Id.*  As to juror number five, the foreman stated:

> Juror number five did not agree with a guilty verdict and then we all discussed back and forth and we said if you feel that they're not guilty, tell us right now not guilty and either work out to which degree we knew we needed to change, to convert towards her thinking or us, her to our thinking.

632 So. 2d at 1080–81.

The court then re-focused its attention on the dissenting juror in the following exchange:

> THE COURT:  Ms. Williams, when I received the verdict here it was indicated that this was a unanimous verdict of all the jurors, now you're telling me when I polled the jury that you don't agree with the verdict?
>
> JUROR:  I personally said not guilty.  But she said to—
>
> THE COURT:  Who's she?  I'm sorry I don't know your name?

THE JUROR:  Barbara said to juror number three, to give reasonable doubt.  Is that what it was?

THE COURT:  You were there, ma'am.  I'm asking you what was said.  You were back there so I'm asking you out of your own mouth.

THE JUROR:  To give her reasonable doubt and I was speaking as far as Alvin.

THE COURT:  Let me ask you this, are these your verdicts?

JUROR:  I did agree to guilty because I wanted to get out of here.  I might be wrong.

THE COURT:  Ma'am, this is a very important case to the State of Florida.  It's a very, very important case to the defendant.  A lot of time, effort, energy and money goes into the conduct of the trial.

Now, a verdict has to be a unanimous verdict and we ask you is there any reason why you cannot be a juror and you indicated there was no reason why you could not be a juror and there was—you agreed to continue as a prospective juror.  You were selected as a juror, you understood what your responsibilities were as a juror.

Now you're saying I'm in a hurry to get out of here.

JUROR:  I apologize.  I'm not in a hurry to get out of here.

THE COURT:  Are you in agreement with the verdict with respect to Mr. Brutton, but are you not in agreement with respect to the verdicts on Mr. Jones, is that what you just said?

JUROR:  I don't believe Mr. Jones is guilty, I believe the evidence shows that he is—that they are—I guess I'm not making sense to you, am I Your Honor?

THE COURT:  I'm asking you did anyone force you or pressure you or exercise duress upon you to reach this verdict?

JUROR:  No.  No.

THE COURT:  Let me talk with one defendant at a time.  This is Mr. Brutton represented by Mr. Wilkov.  Do you have any doubt, do you have a reasonable doubt as to his guilt on Count I, trafficking in cocaine?

JUROR:  Your Honor, I feel the guilty person is not really here. I feel like they really didn't know what they were going to do.  Until they got into the car.

THE COURT:  First of all, initially you said you don't agree with the verdicts, then you said a few moments ago that you didn't agree with respect to Mr. Jones, now I'm asking you with respect to Mr. Brutton. Now you're saying both defendants.  What are you saying ma'am?

DEFENSE ATTORNEY:  Judge, can we go side bar?

THE COURT:  No, I need to know.  This has been a trial we have been involved in for three days here.  The foreman has indicated no duress, no pressure was exercised upon you, you expressed some reservations but ultimately you agreed with the verdict.

And now I'm totally confused as to what your position is and I'm not directing, trying to exert pressure on you, I'm trying to figure out your thoughts about the guilt of the absent defendant, fine and dandy and he may very well be guilty, but we are not concerned about the absent defendant, we are only concerned here with these two defendants.

Now, I'm not—I can't and will not put words in your mouth or force you to take a position one way or the other, I'm just trying to clarify for the record what your position is.

JUROR:  Guilty.

THE COURT:  On both defendants?  Both charges?

JUROR:  Guilty, Your Honor.

THE COURT:  On both defendants?  Both charges?

JUROR:  Yes.

632 So. 2d at 1081–82.  However, the juror subsequently added:

JUROR:  In my heart I felt that they were not guilty, but if with them—in reality they are but—I don't know how to explain it to you.

*Id.* at 1080–82.  The trial court accepted the guilty verdicts.

Applying Rule 3.450, the Fourth DCA held that once the juror stated her initial dissent, the trial court should have returned jury to jury room for further deliberations or declared a mistrial based on the lack of a unanimous verdict.  *Id.* at 1083.  The Fourth DCA noted that it would not have been necessary to declare a mistrial at the time of the polling, because a viable option would have been to send the jury back to deliberate since a unanimous verdict had not been reached.  *Id.* (citing Bouie v. State, 540 So. 2d 925 (Fla. 3d DCA 1989) (no basis for new trial where a juror stated his disagreement with the verdict during polling, the court returned the jury to deliberate, and thereafter, the jury returned the same verdict.)).  And the Fourth DCA cited Spitz with disfavor, stating that it did not favor a per se rule of reversal simply because the trial court polled juror number six after juror number five dissented.  632 So. 2d at

1082 n.1.  However, the Fourth DCA held that a mistrial should have been declared at the point of the juror's last affirmation of the verdict, because it remained equivocal. *Id.* at 1083.

In Jackson v. State, 804 So. 2d 357 (Fla. 4th DCA 2001), the jury foreman indicated, during post-verdict polling, that the verdict was not his. *Id.* at 358. The trial court asked the foreman, "Did you understand [that when] we had announced the verdict, did you understand that it would have to have been unanimous?" *Id.* The foreman answered, "Yes, I did find—agreed with the rest of them." *Id.* The foreman explained that he "changed his mind to agree with the rest of them." *Id.* The trial court then asked the foreman if the verdict read was his verdict. *Id.* The foreman responded, "Yes." *Id.* The trial court then asked the remaining jurors whether the verdict was theirs, and all answered affirmatively. *Id.* The court accepted the verdict. Relying on Brutton, the Fourth DCA reversed the conviction, holding that once the foreman initially indicated without reservation that the verdict was not his, the trial court should have returned the jury for further deliberations and stopped further polling. *Id.*

Here, Petitioner contends the trial court's "numerical jury polling" was per se reversible error, pursuant to Brasfield and Rodriguez v. State, 559 So. 2d 678 (Fla. 3d DCA 1990) (*see* ECF No. 43 at 17). However, both of those cases involved pre-verdict

polling, which was not the case here.  Further, the Supreme Court of Florida abrogated the <u>Rodriguez</u> decision to the extent that it held that such error was fundamental and always required a new trial.  *See* <u>Scoggins v. State</u>, 726 So. 2d 762, 768 (Fla. 1999).  In doing so, the <u>Scoggins</u> court declined to adopt the per se approach of <u>Brasfield</u>, noting that <u>Brasfield</u> was an exercise of the Supreme Court's supervisory powers over the federal courts, and thus not binding on the states.  *Id.* at 764 (citing <u>Lowenfield</u>, 484 U.S. at 240); *see also* <u>Scruggs</u>, 903 F.2d at 1434.

Additionally, Petitioner's reliance upon <u>Edwards</u> and <u>Spitz</u> is misplaced, because those decisions were based upon application of Rule 31(d) of the Federal Rules of Criminal Procedure, which is not controlling upon the state courts.  Further, the federal criminal rule differs from the state rule in that the federal rule provides the trial court with two options if the poll reveals a lack of unanimity, either direct further deliberations or declare a mistrial; whereas, the Florida state rule provides that the trial court must direct further deliberations, which the trial court did in Petitioner's case.  *Compare* Fed. R. Crim. P. 31(d), *with* Fla. R. Crim. P. 3.450.

Moreover, neither federal nor state law provided a basis for a mistrial at the point the trial court continued to poll the jury after Juror Hall's statement, "Yes," she agreed with the verdicts, but "with regrets," and that she "wanted a lot of lesser charges."  The court did not effectively require Juror Hall to vote in the courtroom

(instead of the jury room) or under the compulsion of the court.  Further, Juror Hall's response during polling was not a clear expression of reasonable doubt, or disagreement with or dissent from, the verdicts.  Additionally, the trial court did not accept the guilty verdicts despite Juror Hall's response during polling.  Instead, the trial court only asked for clarification of the meaning of Hall's statement, "Yes, with regrets," to determine whether she had reasonable doubt or was otherwise disclaiming the guilty verdicts, or whether she simply disagreed with the law or was unhappy with the conclusion to which it led (a procedure which was approved in <u>Gonzalez</u>).  When the trial court got the sense that Juror Hall was "hung up" on one of the elements (i.e., the intent element), the court entered the verdicts which Juror Hall had unequivocally affirmed (the guilty verdict on Count 4 and the not guilty verdict on Count 5) and returned the jury for further deliberations on the remaining counts (Counts 1, 2, 3, and 6), with supplemental instructions.  The supplemental charge did not exhort the jurors to consider any extraneous and improper factors, nor did the court instruct the jurors that they must reach a verdict.

At the time of Petitioner's trial, no court had determined that the procedure employed by the trial court under the circumstances presented violated the federal Constitution or state law.  Therefore, it was reasonable for the state court to reject Petitioner's IATC claim based upon Attorney Akbar's failure to immediately move for

a mistrial upon the trial court's continuing to poll the last juror after Juror Hall's response during the initial jury poll, or Akbar's alleged failure to singularly move for mistrial (instead of requesting either a mistrial or further deliberations) at the conclusion of the trial court's individual inquiry of Juror Hall.

Fairminded jurists could disagree as to whether the trial court's procedure was coercive, thus warranting a mistrial instead of further deliberations; but this room for disagreement precludes this federal habeas court from granting relief under the AEDPA. *See* Harrington, 562 U.S. at 786 ("A state court's determination that a claim lacks merit precludes habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."); *id.* (§ 2254(d) preserves the federal court's authority to issue the writ in cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents); *see also* Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1257 (11th Cir. 2101) ("[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied."); Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1127 (11th Cir. 2012) (if, at a minimum, fairminded jurists could disagree about the correctness of the state court's decision, the state court's application of Supreme Court precedent was not unreasonable, and AEDPA precludes the grant of habeas relief) (citing Harrington, *supra*); Johnson v. Sec'y, Dep't of Corr.,

643 F.3d 907, 910 (11th Cir. 2011) (". . . only 'if there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents' may relief be granted.") (quoting Harrington, *supra* ).

Lastly, the court will address Petitioner's sub-claim concerning Attorney Akbar's failure to correct the prosecutor when he stated, during a bench conference, his interpretation of Juror Hall's comments during the jury poll.  Although the state court did not expressly address this sub-claim, it is presumed that the state court adjudicated it.  Section § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits."  *See* Richter, 562 U.S. at 99. When a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits in the absence of any indication or state-law procedural principles to the contrary.  *Id.*  The presumption may be overcome when there is a reason to think some other explanation for the state court's decision is more likely.  *Id.* at 99–100.  The same rule applies when the state court addresses some but not all of the federal claims raised by a defendant.  When a federal claim has been presented to the state court, and the state court opinion addresses some but not all of defendant's federal claims, a rebuttable presumption

arises on federal habeas review that state court adjudicated all of the federal claims on the merits.  *See* <u>Johnson v. Williams</u>, 568 U.S. 289, 133 S. Ct. 1088, 1094, 185 L. Ed. 2d 105 (2013).

Here, neither the circuit court nor the First DCA applied a procedural bar. Further, Petitioner has not rebutted the presumption that the state court adjudicated the merits of his entire IATC claim, including all sub-parts.  Therefore, § 2254(d) applies to the state court's decision.  *See* <u>Richter</u>, 562 U.S. at 100; *see also* <u>Shelton v. Sec'y, Dep't of Corr.</u>, 691 F.3d 1348, 1353 (11th Cir. 2012) (where state appellate court did not apply a procedural bar, the federal habeas court is compelled to presume that the court's one-word per curiam affirmance was an "adjudication on the merits" entitled to AEDPA deference).

The undersigned concludes that the state court reasonably rejected this sub-claim.  Even though Attorney Akbar did not formally object to the prosecutor's interpretation of Juror Hall's statement during the initial jury poll, Akbar told the trial court that he interpreted her statement differently.  Akbar stated, "I think she just doesn't agree with the verdict, and she—it might have been a five to one vote, and she might have said all right.  Let's go.  I think she is a hold out."  Petitioner failed to show a reasonable probability that the result of the proceeding would have been any

different if Attorney Akbar had stated his position as an objection.  The state court's rejection of this sub-claim was thus reasonable.

Petitioner failed to demonstrate that the state court's adjudication of Ground One was contrary to or an unreasonable determination of <u>Strickland</u>, or that it was based upon an unreasonable determination of fact.  Therefore, Petitioner is not entitled to federal habeas relief on the IATC claim asserted in Ground One.

> ### 2.   <u>Trial Court Error</u>

Petitioner also presents a claim of trial court error with respect to the trial court's handling of the issue that arose during the initial polling of the jury (ECF No. 1 at 4–5).  Petitioner contends the trial court erred and created a "somewhat coercive" environment by "confronting" Juror Hall as to whether she understood the jury instructions, and then sending the jury back to deliberate on Counts I, II, III, and IV (*id.*).  Petitioner contends the trial court's procedure violated his substantive due process rights and Rule 31(d) of the Federal Rules of Criminal Procedure (*id.*).

Petitioner appears to acknowledge that this claim of trial court error was procedurally defaulted because it was not presented on direct appeal of his conviction (ECF No. 1 at 4–5).  Petitioner claims that the procedural default was caused by ineffective assistance of appellate counsel (*id.*).  Petitioner states appellate counsel told

him that the claim of trial court error was not preserved in the trial court, and also that the claim was without merit (*id.*).

Ineffective assistance of counsel which rises to the level of a constitutional deprivation can serve as cause for purposes of a procedural default analysis, but the issue of ineffective assistance must first be presented as an independent state claim and exhausted in the state courts. Murray, 477 U.S. at 488; Orazio v. Dugger, 876 F.2d 1508 (11th Cir. 1989). In Florida, a claim of ineffective assistance of appellate counsel is actionable in a petition for writ of habeas corpus filed in the appellate court to which the appeal was taken. *See* Fla. R. App. P. 9.141(d); Davis v. State, 875 So. 2d 359, 372 (Fla. 2003).

Here, Petitioner filed a state habeas petition in the First DCA alleging a claim of IAAC with respect to appellate counsel's failure to argue on appeal that the trial court erred by overruling defense counsel's objection and denying his motion for mistrial based upon Juror Hall's response during polling (Ex. P at 7–17). Petitioner argued that if appellate counsel had presented this claim on direct appeal, there was a reasonable likelihood the case would have been remanded for a new trial based upon the trial court's failure to grant a mistrial (*id.*). The First DCA denied the petition on the merits, with no written explanation for its decision (Ex. Q).

"[T]he summary nature of a state court's decision does not lessen the deference that it is due."  Wright v. Moore, 278 F.3d 1245, 1254 (11th Cir. 2002); *see also* Harrington, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").  Where a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's decision.  *See* Harrington, 562 U.S. at 98.  The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See id.* at 102; *see also* Gill, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

The standard for evaluating a claim of ineffective assistance of appellate counsel is the standard set forth in Strickland.  *See* Smith v. Robbins, 528 U.S. 259, 285, 120

S. Ct. 746, 145 L. Ed. 2d 746 (2000) (citation omitted).  As discussed *supra*, the two components of an ineffectiveness claim under Strickland are performance and prejudice, and if an insufficient showing is made as to one, the court need not address the other.  Strickland, 466 U.S. at 697.  The focus of inquiry under the performance prong of Strickland is whether counsel's assistance was "reasonable considering all the circumstances." *Id.* at 691.  Appellate counsel who file a merits brief need not (and should not) raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success of on appeal.  *See* Jones v. Barnes, 463 U.S. 745, 753–54, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").  To demonstrate prejudice, a petitioner must show a reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, the petitioner would have prevailed on appeal.  *See* Robbins, 528 U.S. at 285.

The Eleventh Circuit has issued several decisions interpreting the Strickland standard with regard to claims of ineffective assistance of appellate counsel.  Appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit."  United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984)).  Additionally,

where an issue is not preserved for appellate review, appellate counsel's failure to raise the issue is not constitutionally deficient as it is based on the reasonable conclusion that the appellate court will not hear the issue on its merits.  Diaz v. Sec'y Dep't of Corrs., 402 F.3d 1136, 1142 (11th Cir. 2005).  Moreover, the arguments omitted from the appeal must have been significant enough to have affected the outcome of the appeal. Nyhuis, 211 F.3d at 1344 (citing Miller v. Dugger, 858 F.2d 1536, 1538 (11th Cir. 1988)).

Here, the record establishes that Petitioner's counsel presented two arguments on direct appeal:  (1) whether the trial court abused its discretion by allowing a police officer to testify about what one of the victims told him, and (2) whether the trial court erred by denying defense counsel's motion for judgment of acquittal as to Count IV (aggravated child abuse with a firearm) (Ex. C at 9–21).  Appellate counsel did not present a claim of trial court error with respect to the court's handling of Juror Hall's response during the jury poll.

The First DCA could have rejected Petitioner's IAAC claim on the theory that there was no reasonable probability of success on appeal if appellate counsel had presented the claim of trial court error, because the trial court's inquiry of Juror Hall was not coercive, and the court committed no error by returning the jury for further deliberations with supplemental instructions when it became clear that Juror Hall did

not agree with the guilty verdicts on Counts I, II, III, and VI. While it is conceivable that an appeal on this issue would have been successful, a reasonable jurist could conclude the opposite, i.e., that Petitioner did not show a reasonable probability of success had his appellate counsel presented the claim.

Petitioner failed to establish he received ineffective assistance of appellate counsel based upon counsel's failure to present the claim of trial court error on direct appeal. He thus failed to show "cause and prejudice" for his procedural default of the claim of trial court error included in Ground One.

B.    Ground Two: "Counsel rendered ineffective assistance of cousnel [sic] by advising Defendant not to testify."

Petitioner claims that Attorney Akbar was ineffective for advising him not to testify (ECF No. 1 at 6; ECF No. 43 at 18–22). Petitioner contends his testimony was the only evidence that supported his defense to the charges, and it was particularly necessary to support his affirmative defense of self-defense to the charge of resisting an officer with violence (Count VI) (*id.*). Petitioner alleges Attorney Akbar acknowledged that the only way to present Petitioner's version of the events to the jury was to have Petitioner testify (*id.*). Petitioner alleges he told Akbar that he wanted to testify, but Akbar told him that it was unnecessary (*id.*).

Respondent contends the state court adjudicated the merits of this IATC claim in the Rule 3.850 proceeding (ECF No. 33 at 29–38).  Respondent contends the state court reasonably concluded that counsel made a strategic decision in advising Petitioner not to testify (*id.*).  Respondent contends the state court's rejection of Petitioner's claim was not contrary to or an unreasonable application of clearly established federal law (*id.*).

      1.      Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

      2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground 2 of his amended Rule 3.850 motion (Ex. F at 43–47).  The state circuit court adjudicated the claim as follows:

> **Procecural [sic] History and Facts**
> Mr. Ferrell was charged by information filed October 20, 2008 with the offenses of Count l Aggravated Battery with a Deadly Weapon Causing Great Bodily Harm, Count 2 Aggravated Assault with a Firearm, Count 3 Aggravated Assault with a Firearm, Count 4 Aggravated Child Abuse with a Firearm, Count 5 Battery on a Law Enforcement Officer, and Count 6 Resisting an Officer with Violence.  The information alleged an offense date of October 12, 2008.
>
> By jury verdict of November 10, 2009, Mr. Ferrell was convicted as charged of counts 1–4, acquitted of Count 5 and convicted of lesser included Resisting without Violence as to Count 6.  The jury made specific findings regarding Mr. Ferrell's possession and discharge of a firearm regarding counts 2–4.

The court sentenced Mr. Ferrell and entered final judgment on March 5, 2010.  Mr. Ferrell was sentenced to the minimum mandatory 20 years in prison for the aggravated assault counts and and [sic] aggravated child abuse followed by lifetime probation for aggravated child abuse.  Mr. Ferrell was sentenced to fifteen years in prison for aggravated battery. The judgment and sentence was affirmed, per curiam and the mandate issued July 5, 2011.

The motion [i.e., the amended Rule 3.850 motion] accurately summarizes the trial evidence.  In summary, the State presented the testimony of Mr. Ferrell's wife and her two children who stated that Mr. Ferrell attacked his wife and pointed a pistol at his wife and her adolescent daughter while threatening to kill them both, and fired the pistol in the air.  Since I am not the judge who conducted the trial, I read the entire trial transcript.

### Testimony of Kisha Ferrell

The prosecution presented the testimony of Kisha Ferrell, the defendant's wife.  Ms. Ferrell testified, in sum, that on the night of the offenses, Mr. Ferrell came home at 2:30 in the morning and awoke her, angry about his dogs being out of their kennel.  Ms. Ferrell testified that inside the house, Mr. Ferrell, "punched me in my mouth, and he hit my head through the closet wall, and it left a hole in the wall."  Ms. Ferrell testified that she surreptitiously dialed 911 and concealed the telephone.

Ms. Ferrell then testified that Mr. Ferrell forced her outside and hit her again, causing her to fall to the ground at which point Mr. Ferrell continued to hit her with his hands, fists and a set of post hold [sic] diggers.  Ms. Ferrell testified that Mr. Ferrell stated, "you going to die tonight bitch" and similar threats.  Ms. Ferrell testified that while trying to get away, she fell, twisted her leg and broke her ankle.  Ms. Ferrell testified that Mr. Ferrell kicked her broken ankle.

Ms. Ferrell testified that when she was unable to stand, Mr. Ferrell went to his truck and got his gun.  He then went into the house with the gun and retrieved Ms. Ferrell's 14 year-old daughter, Khari Wilkerson, "manhandling" her to force her outside.   He then forced Kari [sic]

Wilkerson on her knees next to her mother and stated "both of y'all going to die tonight."  Ms. Ferrell testified that Mr. Ferrell pointed the gun at her and at Kari Wilkerson as they knelt together.  Ms. Ferrell stated that she closed her eyes in anticipation of being shot and heard a clicking sound then heard the gun fire.  Ms. Ferrell opened her eyes and saw that neither she nor her daughter had been shot.  Mr. Ferrell then took Khari Wilkerson back into the house, according to Ms. Ferrell's testimony.

Ms. Ferrell testified that a few minutes later, a deputy arrived.  Mr. Ferrell came back outside without the gun and Ms. Ferrell testified that her broken ankle required two surgeries at the time of trial and might require more surgery.  At the time of the trial, Ms. Ferrell testified that she was still unable to walk.

The post hold [sic] digger, the gun and holster were admitted in evidence.  Ms. Ferrell identified a photo of a hole in her closet, "where he hit my head in there."  The photo was admitted in evidence.  Ms. Ferrell identified photos of her face, head, neck, back and arms depicting what she described as swelling, redness, scratches and bruises Mr. Ferrell inflicted.

Defense trial counsel's cross-examination of Ms. Ferrell focused on inconsistencies between Ms. Ferrell's trial testimony and her written statement given to the police.  The cross-examination was vigorous, but at least on the cold transcript, Ms. Ferrell gives the impression of a strong witness.  On redirect examination, Ms. Ferrell testified that this was "the worst night of my life" and that she was "in hysterics" during and following the incident.

### Testimony of Khari Wilkerson

The prosecution presented the testimony of Khari Wilkerson, Mr. Ferrell's stepdaughter.

Ms. Wilkerson testified that she was 14 at the time of the incident.  She testified that she was awakened by her parents arguing at about 2:30 am.  Ms. Wilkerson heard her mother screaming and called the police and her aunt from a cell phone.  Ms. Wilkerson testified that it seemed like the

fighting and screaming went on for a very long time.  Ms. Wilkerson testified that at some point Mr. Ferrell banged on her door and told her to come out.  "He choked me, and then when I was walking to the kitchen he pushed me and I hit my head like on the corner.  And then I went outside, and I was looking for the dogs."

Ms. Wilkerson testified that after she got outside, she sat on the ground next to her mother and Mr. Ferrell cocked the gun and pointed it at her head from less than a couple feet away.  Ms. Wilkerson testified that she was so scared she could not listen to what Mr. Ferrell was saying.  She testified that he was trying to fire the gun but it got jammed up and wouldn't work.  He then moved a few more feet away and fired the gun into the air.  Ms. Wilkerson testified that he then again pointed the gun at her and appeared to attempt to fire it.  Ms. Wilkerson testified that during this time her mother was screaming and crying and that "her [ankle] bone was popping out."

Ms. Wilkerson testified that at some point, Mr. Ferrell took her back into the house and told her that if he saw her on the telephone he would kill her.  She then went back to her room and soon saw the lights of the police car.

Defense trial counsel vigorously cross-examined Ms. Wilkerson particularly regarding inconsistencies between Ms. Wilkerson's testimony and her mother's testimony.  Particularly, Ms. Wilkerson could not remember seeing the gun when Mr. Ferrell first brought her out of the house and testified that Mr. Ferrell did not "manhandle" or slap her when she was outside.

### Testimony of Chance Gordon

The prosecution presented the testimony of Chance Gordon, Mr. Ferrell's stepson.  Mr. Gordon testified that he was 10 years old at the time of the incident.

Mr. Gordon testified that very late on the night of the incident he heard his "mom screaming, mostly, and yelling."  Mr. Gordon testified that he was already awake when the commotion started because he stayed up late

playing games.  He testified that he heard "one bang" coming from the direction of his mom's closet.  Mr. Gordon testified that his sister came into his room on the phone and then called the police.

Mr. Gordon testified that he looked out his window while his sister was in his room and saw Mr. Ferrell hit his mother with "some kind of post hold [sic] digger, something like that" and that Mr. Ferrell was swinging it.

Mr. Gordon stated that soon after looking through the window, Mr. Ferrell came and got his sister.  He then looked out the window again and saw "both of them on their knees, and he had a gun pointed to their heads."  He heard the gunshot but was not looking out the window when it went off.

Defense trial counsel cross-examined Mr. Gordon regarding inconsistencies in his trial testimony and the statement he wrote at the time of the incident.  Defense trial counsel also suggested that Mr. Gordon was coached.  Defense trial counsel also demonstrated inconsistencies between the trial testimony and deposition testimony, especially that Mr. Gordon mentioned the "post hole digger" for the first time during the trial.  In his prior statements he described the object as a "torch stick."

**Testimony of Clay Joyner**

The prosecution presented the testimony of Clay Joyner, the deputy who responded to the incident.

Deputy Joyner's testimony is largely insignificant except as to the allegation of resisting.  He testified to the scene as he encountered it, Ms. Ferrell's obviously serious ankle injury and his encounter with Mr. Ferrell.

Deputy Joyner's testimony supporting the resisting charge was extremely brief:

Q:  Did you find any weapons on him?

A:  No.

Q:  Did you have any difficulty taking him into custody or putting him in the back of your car.

A:  We—I didn't have any difficulty handcuffing him, but when I went to put him in the car he didn't want to get in the car.  He was standing in the doorway and wouldn't sit down, so I deployed my taser, and done [sic] a dry stun with the taser.

Deputy Joyner then explained the operation of the taser weapon.  The inquiry then continued as follows:

Q:  Does that usually assure compliance?

A:  Yes.

Q:  Did it in this particular case?

A:  Well, when I tased him, yes, he sat down in the car.  But the pain only lasts for a few seconds.  And he wouldn't put his feet in the car so I deployed the taser again, in an attempt to dry stun him to get him to put his feet in, at in [sic] time he kicked my hand and arm that I was holding the taser with.  And then eventually we were able to get him in the car.

Deputy Joyner testified that "the only thing he kept saying, saying something about his dogs, and his dogs being out."

Deputy Joyner testified that he found two live .45 caliber rounds of ammunition and what [sic] spent .45 round nearby the place that Ms. Wilkerson indicated.  Deputy Joyner testified that the pistol was found under the van near the place where he first saw Mr. Ferrell.

The bullets and spent shell casing, the pistol and the post hole diggers were admitted into evidence through Deputy Joyner.

Defense trial counsel's cross examination of Deputy Joyner focused on inconsistencies between his observations and Ms. Ferrell's testimony as to her injuries.

With respect to the resisting count, defense trial counsel asked:

>    Q:  But I guess at some point you said he wasn't getting in the car fast enough?
>
>    A:  He was refusing.  He was becoming belligerent and was refusing to get into the vehicle.
>
>    Q:  All right.  He wasn't kicking at you then, right?
>
>    A:  No, no he wasn't at that time.
>
>    Q:  And even without him offering any violence, you stunned him with a stun gun?
>
>    A:  Yes, to make him comply to get him into my patrol vehicle.
>
>    Q:  And it wasn't until after that that he made the motion to kick at you?
>
>    A:  Yes.
>
>    Q:  When you were attempting to stun him again?
>
>    A:  Yes.

**Legal Analysis**
**Issue 2**

In Issue 2, Mr. Ferrell asserts that defense trial counsel was ineffective "for misadvising the defendant to not take the stand to testify in his behalf."

Both Mr. Ferrell and defense trial counsel testified during the evidentiary hearing.

Mr. Ferrell testified that he wished to testify and that if he had, he would have testified essentially that the incident never happened.  According to Mr. Ferrell, he had an argument with his wife, came home unexpectedly at 2:30 in the morning, awoke his wife to try to find his dogs, never lost his temper, never hit or threatened anyone and only fired the gun accidentally while trying to make sure he had fully unloaded it.  According to Mr. Ferrell the sole reason for possessing the gun was to defend himself from animals that might threaten from the nearby woods.  According to Mr. Ferrell, his wife lied to get back at Mr. Ferrell for what she believed was his unfaithfulness.  Why his 15 year-old stepdaughter and 11 year-old stepson also lied was not explained by Mr. Ferrell.

Mr. Ferrell testified that his lawyer coerced him or forbade him from testifying.  Defense trial counsel testified that he prepared for Mr. Ferrell to testify but that he was increasingly concerned both with Mr. Ferrell's inconsistent versions of events and that Mr. Ferrell tended to leave the impression that he felt that his actions were justified because of his wife's malicious act of letting his dogs out the kennel.  Defense trial counsel testified that he felt he could better defend the case by attacking the credibility and truthfulness of the witnesses rather than take the risk of Mr. Ferrell essentially confessing on the witness stand.

Mr. Ferrell's testimony that he was coerced is also contradicted by his statements in the extensive, plain language colloquy the court conducted with him on the record after the state rested and his lawyer represented that Mr. Ferrell would not testify:

> The Court:  Defendant testifying.  Now, Mr. Ferrell, if you decide to testify, that is the instruction that I would read.  I will pull it aside because it's not read if you don't testify.   Do you understand?
>
> The Defendant:  Yes.

The Court: And it means that they have the apply—the jury has to apply the same rules to the consideration of your testimony they consider as to other witnesses. You don't start ahead you don't start behind, but they can evaluate your credibility like they do any other witness. Do you understand that?

The Defendant: Yes.

The Court: Okay. Now, if you decide not to testify I read 3.9(d), which explains your right not to be a witness, and that the jury cannot view that as an admission of guilt or be influenced in any way by that decision. I think I read that, didn't I, during the jury selection? I think wed [sic] actually got into that, so that's the instruction I would read. So I will put that in my packet, assuming you don't testify.

Now, on that issue, you can change your mind right up until the time your lawyer announces he has rested his case. Do you understand?

The Defendant: Yes.

The Court: So what you are saying to me right now is not binding. It's just we anticipate it so we can plan, but you can change it. You understand that?

The Defendant: Yes.

The Court: So if he stands up and says the defense rests, and you have not been called to the stand, I will assume that that was with your consent. Do you understand that?

The Defendant: Yes.

The Court: I will also assume that if he stands up and announces for you to take the stand, that you've changed your mind and, with your consent, you want to testify. Do you understand that?

The Defendant:  Yes.

The Court:  Now, if he does something or says something like that that is not what you thought was going to happen, or you are surprised or you've changed your mind yet again, that's fine.  Pull on his shirt sleeve, stop, get his attention.  I can send the jury back out and we can straighten up any confusion outside the presence of the jury, and I'm happy to [do] that.  That's when I can fix it before it's too late.  Do you understand that?

The Defendant:  Yes, ma'am.

The Court:  Okay.  The decision to testify or not is yours alone to make.  Your attorney may think it's a good idea for you not to testify, a bad idea, have 50-50 feelings.  It doesn't really matter in a big way.  Bottom line is, he's not God, he doesn't have a crystal ball, he doesn't know what the result will or won't be, depending on your choice.  He has an opinion, and he will share that opinion based on his experience.  But in no way can you construe that [he] has a promise of an outcome.  Do you understand that principle?

The Defendant:  Yes.

The Court:  Okay.  The decision to testify or not is totally yours, even if he has a strong objection, ["]in my opinion if you take the stand you will nail yourself.["]  That's fine.  That may be his opinion.  But in the end it is your case, your decision, and if you decide to testify, he has every ethical obligation to assist you the best way he can within the bounds of ethics.  Do you understand that?

The Defendant:  Yes.

The Court:  Okay.  Do you understand the State has indicated they don't know of any felony history or misdemeanor crimes involving dishonesty, so you would not be impeached with that because they don't know of any, and they also cannot get into

other what we call prior bad acts. If you take the stand, they can cross examine you about the events of that day in great detail. Do you understand that?

The Defendant: Yes.

Defense trial counsel's testimony as to his advice and strategy is credible in light of the evidence in the case. Mr. Ferrell's testimony in the evidentiary hearing supports this conclusion. Even now, even after the jury's verdict, Mr. Ferrell's testimony leaves the strong impression that he is minimizing and justifying his actions because of his litigation interest. His testimony—that he calmly awoke his wife and step-daughter to look for dogs at 2:30 in the morning after a domestic dispute, that his wife essentially hurt herself and that he retrieved his gun to ward off animals—is implausible, particularly in the face of the testimony of his adolescent stepdaughter and 11 year-old stepson. Mr. Ferrell offers no plausible explanation for the physical evidence of his wife's injuries.

That the strategy did not succeed is no basis to call it misadvice or ineffective assistance. Mr. Ferrell was in desperate legal circumstances because of the horrific testimony of his wife and stepchildren and because his own testimony was so implausible.

With respect to the need for Mr. Ferrell to testify to raise the defense of justifiable use of force as to the resisting without violence count, Mr. Ferrell proved neither deficient performance nor prejudice.

First, the resisting charge was trivial both factually and compared with the consequences Mr. Ferrell faced as a result of the conduct alleged in the crimes against his wife and child. Even assuming that the advice required Mr. Ferrell to sacrifice a self-defense argument as to the resisting charge, the advice was sound because it was designed to give Mr. Ferrell the best chance of defending the aggravated assault and aggravated child abuse charges that carried a mandatory minimum 20 year prison sentence and a potential life sentence. But the advice did not require the sacrifice of the self-defense argument as to the resisting count. Defense trial

counsel argued for the self-defense instruction based on the officer's testimony and the court gave the instruction.

Second, Mr. Ferrell's testimony was unnecessary to assert self-defense given Deputy Joyner's admission on cross examination that he stunned or attempted to stun Mr. Ferrell twice even though even though Mr. Ferrell did not commit any violence toward the deputy. The evidence supported the self-defense theory.

Finally, the strategy succeeded as to the resisting count—Mr. Ferrell was convicted of lesser included misdemeanor offense of resisting without violence.

Finally, I conclude that Mr. Ferrell has failed to prove that his decision to remain silent was coerced.

As to Issue 2 I conclude that Mr. Ferrell failed to prove either deficient performance or prejudice.

(Ex. J at 276–86). The First DCA affirmed the decision without written opinion (Ex. M).

The state court's factual findings with respect to the evidence presented at trial, the colloquy between the trial judge and Petitioner during trial, the jury instructions, the verdicts on the only Counts to which Petitioner asserted a self-defense defense (i.e., not guilty on Count V and guilty of only a misdemeanor on Count VI), and the testimony of Petitioner and Attorney Akbar at the post-conviction evidentiary hearing, are supported by the state court record. Therefore, the AEDPA requires that the court accept those factual findings.

Additionally, this court accepts the state court's finding that Attorney Akbar's testimony at the post-conviction evidentiary hearing was credible. "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011); *see also* Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to credibility determinations, that deference is heightened on habeas review) (citing Rice v. Collins, 546 U.S. 333, 341–42, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (stating that "[r]easonable minds reviewing the record might disagree about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination")). Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall v. Lonberger, 459 U.S. 422, 434, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983); *see also* Baldwin v. Johnson, 152 F.3d 1304, 1317 (11th Cir. 1998); Smith v. Kemp, 715 F.2d 1459, 1465 (11th Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing."). Questions of the credibility and demeanor of a witness are questions of fact. *See* Consalvo, *supra* (citing Freund v. Butterworth, 165 F.3d 839, 862 (11th Cir.

1999) (en banc)).  "The deference compelled by the AEDPA requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations."  Nejad v. Attorney, 830 F.3d 1280, 1292 (11th Cir. 2016) (internal quotation marks and citation omitted).  Instead, "[i]n the absence of clear and convincing evidence, [courts] have no power on federal habeas review to revisit the state court's credibility determinations."  *Id.* (emphasis in original) (citation omitted).

Accepting the state trial court's findings of fact, Petitioner knew that the decision to testify was his alone to make, even if defense counsel strongly advised against it, and Petitioner knew that even if counsel disagreed with Petitioner's decision, counsel had an ethical obligation to assist Petitioner the best way he could within the bounds of ethics.  Additionally, it is clear from Attorney Akbar's testimony that his advising Petitioner not to testify was a tactical decision, based upon his discussions with Petitioner regarding his version of the events that night and the evidence presented during the State's case-in-chief (Ex. I at 4–17).  The question for this court is thus whether the state court's conclusion, that Attorney Akbar's strategic decision to advise Petitioner not to testify, was reasonable.

Attorney Akbar's strategy with respect to Counts I–IV was to attack the credibility and truthfulness of the witnesses (i.e., attempt to create reasonable doubt) and argue Petitioner's innocence to the jury—rather than risk Petitioner's essentially

confessing on the witness stand—given that Petitioner had provided Akbar with inconsistent versions of the events, Petitioner tended to leave the impression that he felt that his actions were justified because of his wife's malicious act of letting the dogs out the kennel, and Petitioner's versions "just didn't fully explain what the [physical] evidence was" (*see* Ex. I at 41).  With respect to Counts V and VI (the charges involving Petitioner's interaction with Deputy Joyner), Attorney Akbar adopted a reasonable strategy of eliciting enough facts from Joyner on cross-examination to support a jury instruction on self-defense.  Akbar succeeded in this strategy as the jury acquitted Petitioner on Count V and convicted him of a lesser charge (a misdemeanor) on Count VI.  Eliminating the distorting effects of hindsight, Attorney Akbar's advising Petitioner not to testify was reasonable.

Petitioner failed to demonstrate that the state court's adjudication of Ground Two was based upon an unreasonable determination of fact, or that it was contrary to or an unreasonable application of Strickland.  Petitioner is thus not entitled to federal habeas relief on Ground Two.

C.    Ground Three:  "Counsel was ineffective for advising Appellant to reject the 20-year pre-trial plea offer."

Petitioner alleges Attorney Akbar misadvised him with regard to the strength of the State's case, and counsel failed to explain "how the trial would unfold," which

caused him to reject the State's 13-year and 20-year plea offers (ECF No. 1 at 7–8; ECF No. 43 at 22–26).  Petitioner alleges the State offered him a 20-year non-mandatory sentence, which meant he would actually serve less than 20 years due to gain time (ECF No. 43 at 22–23).  Petitioner alleges he rejected the State's 13-year and 20-year non-mandatory plea offers because of Attorney Akbar's misadvice as to the strength of the State's case (*id.* at 23, 25).  Petitioner alleges Attorney Akbar advised him to reject the plea offers because he probably would not be convicted as charged (*id.*).  Petitioner alleges Akbar explained that the witnesses' versions of the events were inconsistent and exaggerated, and that he (Akbar) would be able to successfully argue to the jury that the inconsistencies proved that their testimony was false (*id.* at 25).  Petitioner alleges Akbar also failed to advise him that he would be able to "tell his side of the story" even if he accepted the plea (Petitioner appears to be referring to his right to elocution at sentencing) (*id.*).  Petitioner suggests he thus rejected the plea offer because he believed that the only way his side of the story would be told is if he went to trial (*id.*).

Respondent contends this claim is partially exhausted (ECF No. 33 at 38–42).  Respondent contends the state court's adjudication of the exhausted portion of Petitioner's claim was not contrary to or an unreasonable application of clearly

established federal law, nor was the state court's adjudication based upon an unreasonable determination of fact (*id.*).

      1.    Clearly Established Federal Law

A defendant's Sixth Amendment right to counsel extends to the plea-bargaining process. Lafler v. Cooper, 566 U.S. 156, 162–63, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012) (citing Missouri v. Frye, 566 U.S. 133, 145, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012), and McMann v. Richardson, 397 U.S. 759, 771, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970)). "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." Lafler, 132 S. Ct. at 1387. The two-part test articulated in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) applies to claims that counsel was ineffective during the plea process. Lafler, 132 S. Ct. at 1384 (applying Strickland's two-part test to federal habeas petitioner's claim that counsel was ineffective for advising him to reject a plea offer); Frye, 132 S. Ct. at 1404, 1409–10 (applying Strickland's two-part test to federal habeas petitioner's claim that counsel was ineffective for failing to communicate a prosecution plea offer before it lapsed); Hill v. Lockhart, 474 U.S. 52, 48, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985) (applying Strickland's two-part test to defendant's challenge to his guilty plea based on ineffective assistance of counsel).

_Strickland_'s first prong requires a defendant to show "'that counsel's representation fell below an objective standard of reasonableness.'" _Hill_, 474 U.S. at 57 (quoting _Strickland_, 466 U.S. at 688). The focus of inquiry under the performance prong of the _Strickland_ standard is whether counsel's assistance was "reasonable considering all the circumstances." _Strickland_, 466 U.S. at 691. The Supreme Court warned about second-guessing professional judgments made by counsel:

> [T]he decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court. Even then the truth will often be in dispute. In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. Counsel must predict how the facts, as he understands them, would be viewed by a court . . . . Questions like these cannot be answered with certitude; yet a decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be. Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts. That a guilty plea must be intelligently made is not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a post-conviction hearing.

_McMann_, 397 U.S. at 769–70.

In a plea situation, counsel must provide advice "within the range of competence demanded of attorneys in criminal cases." _Hill_, 474 U.S. at 56–57 (quoting _McMann_, 397 U.S. at 771). Under this standard, representation is ineffective only if counsel commits "serious derelictions" of his duty when advising the accused. _Stano v._

Dugger, 921 F.2d 1125, 1150–51 (11th Cir. 1991).  Absent such blatant errors, however, the court should "indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." Yordan v. Dugger, 909 F.2d 474, 477 (11th Cir. 1990).  The Eleventh Circuit has commented that "[t]he right to competent plea bargain advice is at best a privilege that confers no certain benefit," because a defendant "may make a wise decision" without assistance of counsel or a "bad one despite superior advice from his lawyer." Wofford v. Wainwright, 748 F.2d 1505, 1508 (11th Cir. 1984) (per curiam).

Strickland's second prong requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  In the context of pleas, "[t]he . . . 'prejudice' requirement . . . focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." Hill, 474 U.S. at 59.

### 2.    Federal Review of State Court Decision

In Petitioner's amended Rule 3.850 motion, he argued that Attorney Akbar improperly advised him to reject the State's 20-year non-mandatory plea offer (Ex. F at 47–50).  Petitioner alleged that if Attorney Akbar had properly outlined the strength of the State's case and explained "how the trial would have unfolded," Petitioner

would have accepted the State's 20-year non-mandatory plea offer (*id.* at 48–50).

Petitioner alleged that Attorney Akbar advised him to reject the offer because he

probably would not be convicted as charged (*id.* at 50). Petitioner alleged that Akbar

explained that the witnesses' versions of the events varied and were exaggerated, and

that he would be able to successfully argue to the jury that the inconsistencies proved

that the stories were false (*id.*). Petitioner also alleged he believed that the only way

his side of the story would be told is if he went to trial, and Akbar failed to advise him

that he would be able to tell his side of the story even if he accepted the plea (*id.*).

The state circuit court adjudicated Petitioner's IATC claim as follows:

In summary, Mr. Ferrell argues in issue 3 that he would have accepted a 20 year plea offer if he had known that by rejecting it he would have been exposed to a 20 year mandatory minimum prison sentence.

During the sentencing hearing, Mr. Ferrell gave a detailed statement regarding his thinking in the case. He stated, in material part:

> The Defendant: And my wife was very pissed off at me at the time when she made those statements, and she had to go by what she said. And she didn't want to but I made them come here. They didn't want to come here but I made them because I wouldn't sign a piece of paper for my life, with 13 years in prison, because I didn't do those things that she was pissed off and wrote about.

Sentencing Hearing Transcript 39.

Mr. Ferrell's position in issue 3 is thus conclusively refuted by the record. He cannot hope to demonstrate that he would have taken a 20 year prison

sentence when, by his own unsolicited admission, he refused to accept a 13 year prison sentence.

(Ex. G at 212).  The First DCA affirmed the decision without written opinion (Ex. M).

Initially, to the extent Petitioner alleges Attorney Akbar failed to communicate the 20-year plea offer (an assertion which Respondent contends was not presented to the state courts), Petitioner's claim of ineffectiveness is defeated by his allegation that Akbar "was ineffective for advising Appellant to reject the 20-year pre-trial plea offer" (thus Petitioner was obviously aware of it).  With respect to the remainder of Petitioner's claim, Petitioner failed to show that the state court's rejection was unreasonable.

Petitioner alleges the lynchpin of his rejection of the State's 13-year and 20-year plea offers was Attorney Akbar's misadvice concerning the strength of the State's case. However, Akbar's assessment of the strength of the State's evidence and his ability to create reasonable doubt by pointing out inconsistencies and exaggerations with respect to the witnesses' versions of the events, and Akbar's prediction as to how the jury would ultimately view the evidence, do not rise to the level of unreasonableness that is required to satisfy the deficient performance prong of the Strickland standard. Petitioner's allegations do not suggest that Attorney Akbar committed blatant errors or serious derelictions of his duty with respect to his assessment of the State's case.

Petitioner failed to establish that the state court's adjudication of Ground Three was contrary to or an unreasonable application of clearly established federal law. Therefore, he is not entitled to relief on Ground Three.

> D.    Ground Four:  "Trial counsel rendered ineffective assistance of counsel by failing to move for mistrial based on prosecutor's closing arguments."

Petitioner alleges the prosecutor engaged in improper burden-shifting during closing arguments (ECF No. 1 at 9; ECF No. 43 at 26–32).  Petitioner contends Attorney Akbar failed to move for a mistrial based upon the prosecutor's arguments (*id.*).  Petitioner contends counsel's alleged error caused the issue to be un-preserved for appellate review, thus depriving Petitioner of his federal due process rights (*id.*).

Respondent contends Petitioner is not entitled to relief on this claim, because the state court adjudicated the merits of the claim, and Petitioner has not demonstrated that the state court decision was "objectively unreasonable" or contrary to or an unreasonable application of clearly established federal law (ECF No. 33 at 43–52).

> 1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

> 2.    Federal Review of State Court Decision

In Ground 4 of Petitioner's amended Rule 3.850 motion, Petitioner claimed that Attorney Akbar was deficient for failing to object to the State's improper comments

during closing arguments, and failing to move for a mistrial regarding the comments

(Ex. F at 51–53).  The state circuit court adjudicated the claim as follows:

> In Issue 4, Mr. Ferrell asserts:
>
> During the State's rebuttal closing the assistant state attorney engaged in burden shifting arguments three times.  First, the State challenged the defense to prove that [Chance Gordon] was coached as to what to say on the stand on two occasions.  Thirdly, [sic] the State challenged the defense to prove that Deputy Joyner was engaged in unlawful force when the Dfeendant [sic] kicked his hand during the second tasing event.  In all three instances defense counsel objected and the Court gave curative instructions that the burden of proof always remains on the State and never shifts to the defense.
>
> Although acknowledging that, "In all three instances defense counsel objected and the Court gave curative instructions that the burden of proof always remains on the State and never shifts to the defense," Mr. Ferrell asserts that defense trial counsel was deficient for failing to move for a mistrial.
>
> Defense trial counsel testified that he did not move for a mistrial because the court did not sustain the objections, gave a cautionary instruction and he did not believe that a mistrial was justifiable.
>
> I conclude that the defense failed to prove either deficient performance or prejudice.

(Ex. J at 287).  The First DCA affirmed the decision without written opinion (Ex. M).

The specific prosecutorial comments identified by Petitioner were made during the prosecutor's rebuttal argument, after Attorney Akbar had made his closing argument.  Attorney Akbar argued the following, in relevant part:

So number one, the aggravated battery with a deadly weapon, the conflict in evidence is between what her [Kisha Ferrell's] testimony is and what the evidence shows.  That is going to do a lot more damage than what is in those pictures, number one.

Number two, she stated that he—they came out of the house, he grabbed the post hole diggers, and she fell on the ground.  He tried to hit her with the post hole digger what [sic] she was on the ground.  She was dodging him.  She got up off the ground with him still holding the post hobble [sic] diggers, but she was able to get off the ground with him standing right next there [sic].

We're not sure what happened to him, but she ran down the street to the neighbor's house, and the kids testified and told you how far the neighbor's house is, but she ran almost to the next door neighbor's house.

Outside the house he was able to catch her down the street, hit her with the post hole digger, knock her down, and she got back up again, and then he hit her several times while she was on the ground.

What is wrong with that story?  Again, Chance Gordon got on the stand, and he said he saw it.  He said he saw this torch, or in his statement he said he saw a torch.  Then he saw a tool, when I took his deposition, and then in court today he finally he got down to saying it was post hole diggers.

So what's wrong that is it's clear that Chance Gordon was being coached.  Number two, it directly contradicts what she is saying about running down the street and getting hit down the street with the post hole diggers.

So you must answer the question, **or the state attorney must answer the question:  Why, number one, it is obvious that Chance Gordon was being coached about that particular thing**.

If he actually did see it, why is it now that he suddenly remembers that it was a post hole digger?  Why is it the first time he said it was a torch?  And why does it contradict what she is saying about running down the street?  They said if you go out the gate and make a left, there's nothing but woods, and you have to go a little bit further to go to the neighbor's house.

**So why the huge difference in those stories?  Can the state attorney explain that when he comes back up here?**  That's a major difference in the story.

So why was he coached about that part of the story?  Why is that such a contradiction in the stories?  Because it didn't happen.  There were no post hole diggers.  There was no beating by a post hole digger.  The pictures don't show it, and the evidence from that stand is a huge conflict, and there is a reasonable doubt from that conflict in that evidence.

. . . .

Next the State has the prove [sic] the aggravated assault with a firearm, both on will [sic] Ms. Kisha Farrell and on Khari Wilkerson.  Again with that charge, the State has the burden of proof beyond a reasonable doubt.  There's no difference.  They have to prove beyond a reasonable doubt that Mr. Ferrell threatened Kisha and/or Khari with that gun.  If you will all recall, we heard several stories with the gun.  When gun [sic] was seen, when the gun was brought out, where the gun was pointed, where it was away, whether it was at her head, we heard several stories about that, how many gunshots there were outside, and again we have to question the question:  why so many stories about something that is supposed to be so simple, so specific.

Again, Chance.  His complete original statement was we were outside—well, my mom and dad were arguing.  My mom got—dad got his gun, he told my mom to go outside, he came back inside, he put the gun down, he got a torch stick.  He hit my mama with it, he came back inside, got my sister, told her to go outside, and then I heard a shot.

So why is his story completely different than the story everybody else gave?  Number one, why is his story completely different from the story he testified to today?  Why today did he come in and say well, the first time I saw my dad with the gun is when he went back outside with the car, instead of, then I saw him with the gun, then he put the gun down, chased my mom down with a torch.  Then he came back inside, got Khari and went back outside in heard a gunshot.  He never said he saw the gun; he just said he heard the gunshot.

Two completely different stories.  **Again, why is he coached on those things?  If it's the truth, if it's what happened, why are they coaching him about those things?  That the [sic] question that the State needs to answer**, and that's the conflict in the evidence, which you could use to show that there's a reasonable doubt in the evidence. . . . .

Battery on a law enforcement officer.  You will see a jury instruction dealing with battery on a law enforcement officer, and one of the jury instructions justifiable use of non deadly force.  In that instruction you will see that the defendant will be justified to use non deadly force against Deputy Joyner if he believed that such conduct was necessary to defend himself, and that use of the unlawful force by Deputy Joyner must have appear to be ready to take place.

There's an exception, however, for law enforcement officers, which means usually with a law enforcement officer, **and I'm sure the State will tell you**, is that you can't respond.  But the only time you can respond to a law enforcement officer with some type of force is—in defending yourself is if there some kind of excessive force being used by that law enforcement officer.

What the evidence shows and what Deputy Joyner told you was that he tased Mr. Ferrell with 50,000 volts because he wouldn't sit down in his car.  He tased him because he would not sit down in his car, and then pulled out the taser once again, Mr. Ferrell saw that, and he did what he had to do to stop those 50,000 volts from going into him.

He kicked his hand. He didn't spit on him, he didn't knee kick him. He didn't try to do anything more. He just kicked his hand, kicked at the taser to stop him from getting those 50,000 volts in his leg.

Obviously he was already in the sitting position, and obviously, like the State told you, he was in handcuffs. And you have the ability to take into consideration the physical abilities of the defendant and the victim. In considering the issue of self defense you may take into account the relative physical abilities and capacities of the defendant and victim.

So both the battery on a law enforcement officer and resisting violence case, Mr. Ferrell was justified in what he did in order to avoid getting those 50,000 volts inserted into him.

. . . And it's not my burden to prove anything. It's not Mr. Ferrell's burden to prove anything.

You will see in the jury instructions that you cannot hold it against him if he does not testify. The burden is totally on the State. What these witnesses tell you, what the State presented to you in these pictures, and you can use that evidence or lack thereof, or the conflict in that evidence, to hold the State to their burden and to say that Mr. Ferrell is not guilty on all counts.

(Ex. V at 174–78, 183–85) (emphases added).

The prosecutor argued the following in rebuttal:

MR. ALLMAN: Ms. Ferrell testified that those photos were taken about two days later, so of course you are not going to see any blood in her mouth.

I what than the [sic] make clear that not every conflict in testimony automatically results in a reasonable doubt. Conflict in the testimony may result from a reasonable doubt, but you get to decide.

Where is the evidence of coaching?  The defense spend [sic] a lot of time about Chance was coached, he was coached, he was coached.  The defense want to accuse people of coaching that little boy.  Well, this is court of law.  This is the place for proof.  **Prove it.**

MR. AKBAR:  Objection, Your Honor.  Improper burden shifting.

MR. ALLMAN:  Fair comment on the argument.

THE COURT:  **Let me do a special instruction.  The burden of proof never shifts from the State to the defense.  However, the State may comment on evidence or lack of evidence supporting a theory of the defense.**

**So with that qualification, you may continue in your argument about what evidence exists or doesn't exist.  In no event should the jury consider that this shifts the burden in any way.**

MR. ALLMAN:  That's absolutely correct.  The State carries the burden of proof on the element of all of the offenses.  But they want to come in here and accuse that little boy of being coached, and somebody coaching him.  Well, they asked him, and what did he say?  No one told me what so say.  **Where is the proof?**

Does he seem like he was lying?  This goes back to what we talk to you about in jury selection.  You don't leave you have [sic] common sense at the door.  Evaluate the witnesses like you do your own family, friends, co-workers, people you meet on the street.
. . . .
Unlawful force.  The defense said they can resist Deputy Joyner, because he was engaged in unlawful force.  **Well, where is the evidence of unlawful force?**  The defendant wouldn't get in the car.  The deputy used a piece of equipment that was issued to him and that he was trained to use.  That's not unlawful force.

MR. AKBAR:  Your Honor, I object as to improper burden shifting.  We don't have to prove unlawful force.

**THE COURT:  Well, the ultimate burden never shifts, but through cross examination there was the argument that the issue of self-defense. It never shifts, that's correct.  But the State can still comment on what they feel is the lack of evidence to support the theory of the defense.**

**So again, does the jury understand the difference I'm talking about here between the burden never shifts.  The defendant is never required to prove anything.  But the State is entitled to argue to you what they feel may be the lack of evidence to support a defense theory.   That is proper.   Do you understand the difference?  Everybody?  Okay.  I'm getting head nods**.

Go ahead, Mr. Allman.

MR. ALLMAN:  That's exactly right.  The defense comes in and says there's unlawful force.  Just ask yourself.  Was there unlawful force?  There's no evidence of it.

The defense says well, he had to kick Deputy Joyner to keep from getting tased.  Well, here's a novel concept.  Why not just get in the car?  Then you're not going to get tased.

I submit to you this the defendant's conduct with the arresting officer was consistent and emblematic and a continuation of his conduct that entire night.  He was out of control.
. . . .
And in response to all the whys, why, why, that the defense was submitting to you in their closing arguments, here's a why for you.  Why would everybody be making this up?  People lie.  They do it for a reason, right?  Why?

Well, I submit to you the reason why is that it's not made up.  It happened just like they said.

Does it come to you without some—I should say does it come to you with some inconsistencies?  You could say it comes to you with

some warts, absolutely.  But the flip side is if people come in here, and
they testify chapter and verse with surgical precision, then what is the
argument?  It's cooked up.  It's too perfect.

I submit to you the fact it is not perfect adds to its credibility.  It
doesn't detract from it.

(Ex. V at 188–92) (emphases added).

Both Attorney Akbar and the prosecutor reminded the jury during their
arguments that the State had the burden of proving each element beyond a reasonable
doubt (Ex. V at 152, 172–73, 177, 182, 184–85, 187).

Immediately after the prosecutor's rebuttal argument, the trial court instructed
the jury (Ex. V at 192–210).  Included in those instructions were specific instructions
that before the jury could find Petitioner guilty, the State was required to prove all
elements of the crimes charged beyond a reasonable doubt (*id.*).  The instruction as to
the State's burden of proof was also included in the written jury instructions, which
were sent back with the jury during deliberations (Ex. A at 54–80; Ex. V at 214).

During the post-conviction evidentiary hearing, Attorney Akbar testified that he
did not believe he had a meritorious basis for moving for a mistrial (*see* Ex. I at 11–12,
18).  Attorney Akbar explained that the trial court did not expressly rule on his
objections, and following each of his objections, the court gave special instructions
which emphasized to the jury that the burden never shifted from the State to the

defense, and the court commented that the State was permitted to make fair comments on the evidence or the lack of evidence (*see id.*).

Under Florida law, the standard for reviewing prosecutorial comments is the following:

> Wide latitude is permitted in arguing to a jury. Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments. The control of comments is within the trial court's discretion, and an appellate court will not interfere unless an abuse of such discretion is shown. A new trial should be granted when it is "reasonably evident that the remarks might have influenced the jury to reach a more severe verdict of guilt than it would have otherwise done." Each case must be considered on its own merits, however, and within the circumstances surrounding the complained-of remarks.

Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982) (quoting Darden v. State, 329 So. 2d 287, 289 (Fla. 1976)) (other citations omitted). The prosecutor may not, however, "'inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.'" Jones v. State, 612 So. 2d 1370, 1374 (Fla. 1993) (quoting Bertolotti v. State, 476 So. 2d 130 (Fla. 1985)). This state rule is essentially the same as the federal due process standard governing allegedly improper argument by the prosecution. A prosecutor may argue both facts in evidence and reasonable inferences from those facts. *See* Tucker v. Kemp, 762 F.2d 1496, 1506 (11th Cir. 1985) (citations omitted). But if the evidence is too insubstantial to support

a reasonable inference, the prosecutor's comment will be deemed improper.  *Id.* at 1507.  Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury may reasonably draw from it and the impermissible practice of arguing suggestions beyond the evidence.  *See* United States v. Simon, 964 F.2d 1082, 1086 (11th Cir. 1992) (citation omitted).

Further, the prosecutor is not limited to a bare recitation of the facts; he may comment on the evidence and express the conclusions he contends the jury should draw from the evidence.  United States v. Johns, 734 F.2d 657, 663 (11th Cir. 1984).  A prosecutor may comment on the uncontradicted or uncontroverted nature of the evidence and may point out that there is an absence of evidence on a certain issue during closing argument to the jury.  *See* White v. State, 377 So. 2d 1149 (Fla. 1980).  Additionally, prosecutorial comment upon a general lack of defense evidence is permissible.  *See* Smiley v. State, 395 So. 2d 235 (Fla. 1st DCA 1981).

Attempts to bolster a witness by vouching for his or her credibility are improper "if the jury could reasonably believe that the prosecutor indicated a personal belief in the witness' credibility." United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991) (citing United States v. Sims, 719 F.2d 375, 377 (11th Cir. 1983)).  A jury could believe that the prosecutor personally believed in the witness' credibility "if the prosecutor either places the prestige of the government behind the witness, by making explicit

personal assurances of the witness' veracity, or the prosecutor implicitly vouches for the witness' veracity by indicating that information not presented to the jury supports the testimony." *Id.* (citation omitted).  Thus, the court must examine whether (1) the prosecutor explicitly personally assured the witness' credibility, or (2) the prosecutor implicitly vouched for the witness' credibility by implying that evidence not presented to the jury supports the witness' testimony.  United States v. Castro, 89 F.3d 1443, 1457 (11th Cir. 1996) (citing Sims, 719 F.2d at 377).

However, it should be noted that "[t]he prohibition against vouching does not forbid prosecutors from arguing credibility . . . it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury."  United States v. Hernandez, 921 F.2d 1569, 1573 (11th Cir. 1991).  Furthermore, when the prosecutor voices a personal opinion but indicates this belief is based on evidence in the record, the comment is not improper.  United States v. Granville, 716 F.2d 819, 822 (11th Cir. 1983) (finding no prosecutorial misconduct where prosecutor, in effort to support testimony of two government witnesses, only pointed to matters in evidence: the demeanor of one witness and testimony of support witnesses, as well as a tape recording corroborating the testimony of another) (citations omitted).  Likewise, a prosecutor may reply to remarks, comments or assertions made by defense counsel. *See* United States v. Young, 470 U.S. 1, 11–13, 105 S. Ct. 1038, 84 L. Ed.2 d 1 (1985)

(when prosecutor's comments are an "invited reply" in response to defense counsel's own remarks, and he "[does] no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction") (citations omitted).

Finally, "the limits of proper argument find their source in notions of fairness, the same source from which flows the right to due process of law." Houston v. Estelle, 569 F.2d 372, 380 (5th Cir. 1978). "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L. Ed. 2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)). Thus, to establish prosecutorial misconduct, a two-prong test must be satisfied: (1) the prosecutor's comments must have been improper; and (2) the comments must have rendered the trial fundamentally unfair. See Eyster, 948 F.2d at 1206 (citations omitted); Brooks v. Kemp, 762 F.2d 1383, 1400 (11th Cir. 1985) (en banc), vacated on other grounds, 478 U.S. 1016, 106 S. Ct. 3325, 92 L. Ed. 2d 732 (1986), reinstated, 809 F.2d 700 (11th Cir. 1987); Dessaure v. State, 891 So. 2d 455, 464–65 (Fla. 2004) (an order granting mistrial is required only when the error upon which it rests is so prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that the defendant receives a fair trial).

Upon review of the evidence adduced at trial, the entirety of the arguments of the prosecutor and defense counsel during closing arguments, and the court's instructions to the jury, the undersigned concludes that Petitioner failed to show that Attorney Akbar's failure to move for a mistrial based upon the comments identified by Petitioner constituted deficient performance, or that there is a reasonable probability the outcome of <u>trial</u> would have been different if counsel had moved for a mistrial.[6]

The state court's adjudication of Ground Four was not based upon an unreasonable determination of fact, nor was it contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, Petitioner is not entitled to relief on Ground Four.

E.    <u>Ground Five: "Trial counsel render [sic] ineffective assistance of counsel by failing to move for judgment of acquittal or new trial based on sufficiency of the evidence."</u>

Petitioner claims Attorney Akbar was ineffective for arguing a motion for judgment of acquittal ("JOA") only as to Count IV, instead of including Counts I–III in the motion (ECF No. 1 at 10; ECF No. 43 at 32–34).  Petitioner identifies only one

---

[6] Petitioner contends the state court failed to consider that Attorney Akbar's alleged error (i.e., failure to move for a mistrial) deprived Petitioner of appellate review of the issue.  However, as previously discussed, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), <u>Strickland</u> prejudice is gauged against the outcome of the trial, not on appeal.  *See* <u>Purvis</u>, 451 F.3d at 739 (citing <u>Strickland</u>, 466 U.S. at 694–95).

argument that Akbar should have made, namely, that with regard to Count I, there was no evidence that Kisha Ferrell's broken ankle was directly attributable to an act of Petitioner (*id.*).  Petitioner also claims Attorney Akbar should have filed a written motion for new trial, based on the argument that the evidence was insufficient to sustain the convictions, and the verdicts were contrary to the law or weight of the evidence (*id.*).  Petitioner argues Attorney Akbar's alleged errors deprived him of appellate review of the issue of the sufficiency of the evidence to support the convictions (*id.*).

Respondent contends Petitioner is not entitled to relief on this claim, because the state court adjudicated the merits of the claim, and Petitioner has not demonstrated that its decision was "objectively unreasonable" or contrary to or an unreasonable application of clearly established federal law (ECF No. 33 at 52–58).

1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground 5 of his amended Rule 3.850 motion (Ex. F at 54–57).  The state circuit court adjudicated the claim as follows:

> In Issue 5, Mr. Ferrell asserts that trial counsel's "motion for judgment of acquittal was inadequate to challenge the sufficiency of the evidence to the majority of the counts the Defendant was on trial."  With respect to

a motion for new trial, Mr. Ferrell asserts, "Defense also failed to file a written motion for new trial based on the argument that the evidence was insufficient to sustain the conviction and the verdict was contrary to the law or the weight of the evidence."

Mr. Ferrell acknowledges that, "A motion based on the sufficiency of the evidence must be specific, and a boilerplate motion is inadequate. Florida law has often condemned an attorney who files a boilerplate motion for judgment of acquittal that fails to articulate a facially sufficient basis on which a trial court might otherwise grant relief."

Yet Issue 5 consists almost exclusively of non-specific citation to legal truisms.  The only attempt at applying these concepts to the evidence in the case is the following three sentences:

> One element for which evidence was not produced at trial was just how Mrs. Ferrell's ankle was broken; the injury was never directly attributed to any specific act of the Defendant.  Rather, she merely slipped and fell.  This injury formed the serious and substantial injury supporting the aggravated reclassification of the battery charge in Count I.

As the motion itself makes exceedingly clear, three eyewitnesses testified in detail to Mr. Ferrell's violent conduct.  With respect to the broken ankle, the defendant's wife Kisha Ferrell testified that [ ] she was awoken by the defendant at 2:30 am, punched in the face, and had her head bashed into a wall.  Then, she was taken outside by the defendant and again punched and slapped, grabbed by the neck, and swung at with a post-hole digger.  Mrs. Ferrell then ran but the defendant caught her and hit her again, she testified.  Mrs. Ferrell testified that Mr. Ferrell hit her in the back of the head with the metal part of the post-hole digger at least twice but her thick, heavy hair cushioned the blow.  Ms. Ferrell then testified:

> Mrs. Ferrell:  We were outside on the road.  He grabbed me by the neck and told me he was going to kill me and bury me by the neck and told me he was going to kill me and bury me in the ditch on

the side of the road.  He said you going to die tonight bitch.  You going to die.  I kept pleading with him, why are you doing this?  I'm your wife.  You not my wife, you don't love me.  You don't want me.  You don't want me.  You going to live [sic] me.  I'm going to kill you tonight, bitch.  I'm going to kill you tonight.

And we made it back, and he pushed me and kept pushing me and hitting me with those post hole diggers, with the stick and with the metal part.  And we made it back—he grabbed me by the neck, forcing me back into our driveway.

The Prosecutor:  Okay.

Mrs. Ferrell:  He had me by the neck in front of me.  I still have marks on my neck.  And I fell, because when I ran I lost one of my flip flops and it was 2:30 in the morning, so the grass was dewy, and I slipped and fell as he grabbed me by the neck, because I was going backwards.

The Prosecutor:  So he was grabbing you when you fell?

Mrs. Ferrell:  Right.

The Prosecutor:  And he was grabbing you where?

Mrs. Ferrell:  He had me by the neck.

The Prosecutor:  Okay.  And whereabouts were you when you fell?  Were you back on your property?

Mrs. Ferrell:  I was back on my property, in the grass.

The Prosecutor:  And when you fell, tell us what happened.

Mrs. Ferrell:  When I fell, he said get up, get your ass up and help me find my dogs.  I said I can't get up.  Something is wrong with my leg.  My leg was twisted.  It looked deformed.  And he kicked

me in my foot at that time.  He said ain't nothing wrong with your damn leg, and he kicked my leg.

The Prosecutor:  What was wrong with your leg?

Mrs. Ferrell:  It was hanging like this.  It was broken.

The Prosecutor:  At the ankle?

Mrs. Ferrell:  At the ankle.  My foot was literally hanging like this. I had to hold my foot up like this.  It was hanging the whole entire foot.

The Prosecutor:  Were you able to stand?

Mrs. Ferrell:  No.

The Prosecutor:  Okay.  Is that the ankle that Mr. Ferrell kicked you in?

Mrs. Ferrell:  Right.

The Prosecutor:  All right.  Did that cause you some pain?

Mrs. Ferrell:  Yes.

The Prosecutor:  Severe?

Mrs. Ferrell:  Severe.

Trial Transcript at 30–35.

As the transcript makes clear, a motion based on the sufficiency of the evidence as to Mr. Ferrell's responsibility for Mrs. Ferrell's broken ankle was futile.  With respect to issue 5 Mr. Ferrell's position is conclusively refuted by the record and is therefore DENIED.

(Ex. G at 213–16).  The First DCA affirmed the decision without written opinion (Ex. M).

Petitioner acknowledges that Attorney Akbar moved for a JOA as to Count IV, and he does not identify any deficiency with respect to Akbar's argument on that Count (*see* ECF No. 1 at 10; ECF No. 43 at 32–34).  Indeed, review of Attorney Akbar's argument in support of his motion for JOA reveals no deficiency that rises to the level of ineffectiveness as to Count IV (*see* Ex. V at 126–30).

With respect to Counts I–III, under Florida law, a trial court should not grant a motion for JOA "unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." Boyd v. State, 910 So. 2d 167, 180 (Fla. 2005) (internal quotation marks and citation omitted).  In "moving for a judgment of acquittal, a defendant admits not only the facts stated in the evidence, but also every reasonable conclusion favorable to the state that the trier of fact might fairly infer from the evidence."  *See* Rasley v. State, 878 So. 2d 473, 476 (Fla. 1st DCA 2004) (internal quotation marks and citation omitted).  The rule is firmly entrenched that "[i]f, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction." Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002).

With respect to Count I, Petitioner contends Attorney Akbar should have argued there was insufficient evidence that Kisha Ferrell's broken ankle was caused by Petitioner, as opposed to Ms. Ferrell's simply slipping and falling. The elements of aggravated battery are the following: (1) Petitioner unlawfully, actually, and intentionally touched or struck Kisha Ferrell against her will, and (2) Petitioner, in committing the battery, (a) intentionally or knowingly caused great bodily harm or permanent disability or permanent disfigurement to Kisha Ferrell, or (b) used a deadly weapon, defined as a weapon used, or threatened to be used, in a way likely produce death or great bodily harm (*see* Ex. A at 54, 57). *See* Fla. Stat. § 784.045. As the state court determined, viewing the evidence adduced at trial in the light most favorable to the State, including Kisha Ferrell's testimony and the photographs of her injuries (*see* Ex. W), a rational trier of fact could find, beyond a reasonable doubt, that Petitioner unlawfully, actually, and intentionally touched or struck Kisha Ferrell against her will, and in doing so, Petitioner intentionally or knowingly caused great bodily harm to Kisha Ferrell, or used a deadly weapon.

The elements of aggravated assault with a firearm (charged as Count II with respect to Kisha Ferrell as the victim, and Count III with respect to Khari Wilkinson as the victim), are: (1) Petitioner unlawfully and intentionally threatened, either by word or act, to do violence to the victim, (2) at the time, Petitioner appeared to have

the ability to carry out the threat, (3) Petitioner's act created in the mind of the victim a well-founded fear that the violence was about to take place, and (4) the assault was made with a firearm (defined as any weapon which will, is designed to, or may readily be converted to expel a projectile by the action of an explosive) (*see* Ex. A at 50–60). *See* Fla. Stat. §§ 784.021(1), 790.001(6).  Here, viewing the evidence adduced at trial in the light most favorable to the State, including Kisha Ferrell's testimony, Khari Wilkerson's testimony, and the two live .45 caliber rounds of ammunition and a spent .45 round near the place that Khari Wilkerson indicated that Petitioner attempted to fire the gun (*see* Ex. W at 81–82), a rational trier of fact could find, beyond a reasonable doubt, that Petitioner committed aggravated assault with a firearm as to each victim.

Finally, Petitioner contends Attorney Akbar was ineffective for failing to file a motion for new trial, on the ground that the evidence was insufficient to sustain the convictions, and the verdicts were contrary to the law or the weight of the evidence. Rule 3.600 of the Florida Rules of Criminal Procedure sets forth the grounds for granting a new trial.  An argument that the evidence was insufficient to sustain the convictions is not one of those grounds.  *See* Fla. R. Crim. P. 3.660(a)–(b).  Further, although one of those grounds is that the verdict is contrary to law or the weight of the evidence, *see* Fla. R. Crim. P. 3.600(a)(2), Petitioner failed to show that Attorney

Akbar had a meritorious basis for making this argument. Indeed, none of the verdicts were contrary to law or the weight of the evidence.

Petitioner failed to demonstrate that the state court's adjudication of Ground Five was contrary to or an unreasonable application of <u>Strickland</u>. Therefore, Petitioner is not entitled to habeas relief on Ground Five.

> F.    <u>Ground Six: "Counsel's ineffectiveness for failing to move for a mistril [sic] which amounted to a cumulative deficient performance prejudicing Petitioner's right to a fair trial."</u>

Petitioner contends that the cumulative effect of the errors of trial counsel, appellate counsel, the prosecutor, and the lower court, as set forth in his § 2254 petition, show that he was deprived of a fair trial (ECF No. 1 at 11–12; ECF No. 43 at 35–36).

Respondent contends the only aspect of Ground Six that Petitioner fairly presented to the state courts was a claim that the cumulative effect of trial counsel's deficient performance prejudiced Petitioner, which was asserted as Ground 7 of Petitioner's amended Rule 3.850 motion (*see* ECF No. 33 at 60–62). Respondent contends Petitioner waived that claim because he failed to secure a ruling from the state court (*id.*). Respondent alternatively argues that even though the state court did not expressly rule on the claim, the state court adjudicated the merits by finding no merit to any of Petitioner's individual IATC claims (*id.* at 61–62). Respondent

contends the merits adjudication was not contrary to or an unreasonable application of clearly established federal law (*id.* at 62–63).  Respondent contends the remainder of Petitioner's "cumulative effect" claim is procedurally barred from federal review (*id.* at 62).

The state court record shows that in Petitioner's state habeas petition filed in the Supreme Court of Florida, Petitioner presented the same claim he presents as Ground Six of his § 2254 petition (*see* Ex. R).  He claimed that the cumulative effect of the errors of trial counsel, appellate counsel, the prosecutor, and the state court deprived him of a fair and impartial trial (*id.*).  The state supreme court dismissed the petition for lack of jurisdiction, citing provisions of the Florida Constitution setting forth the court's jurisdiction (*see* Ex. S).

This federal court will deem a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *See* <u>Coleman v. Thompson</u>, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); <u>Caniff v. Moore</u>, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts.").

However, a federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal

question. *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989).

The adequacy of a state procedural bar to the assertion of a federal question is itself

a federal question. Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 151 L. Ed. 2d 820

(2002).

The Eleventh Circuit has set forth a three-part test to determine whether a state

court's procedural ruling constitutes an independent and adequate state rule of

decision. Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state

court rendering judgment must clearly and expressly state it is relying on state

procedural rules to resolve the federal claim. *Id.* Second, the state court's decision on

the procedural issue must rest entirely on state law grounds and not be intertwined

with an interpretation of federal law. *Id.* Third, the state procedural rule must be

adequate. *Id.* The adequacy requirement has been interpreted to mean the rule must

be firmly established and regularly followed, that is, not applied in an arbitrary or

unprecedented fashion. *Id.*

To overcome a procedural default, the petitioner must show cause and prejudice

or a fundamental miscarriage of justice in order for the federal habeas court to reach

the merits of a claim. Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993). "For cause

to exist, an external impediment, whether it be governmental interference or the

reasonable unavailability of the factual basis for the claim, must have prevented

petitioner from raising the claim." <u>McCleskey v. Zant</u>, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." <u>Schlup</u>, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*

Here the state supreme court's procedural ruling constituted an independent and adequate state rule of decision; therefore, Petitioner's "cumulative effect" claim is procedurally barred from federal review.  Further, Petitioner has not satisfied either of the exceptions to the procedural bar.

Moreover, even if Petitioner exhausted the aspect of his claim related to the cumulative effect of trial counsel's alleged errors, he is not entitled to federal habeas

relief. The Eleventh Circuit has never expressly recognized a freestanding "cumulative effect" claim, based upon the assertion that alleged errors of the trial court, defense counsel, or the State, or a combination thereof, rendered the trial fundamentally unfair even though such errors were individually harmless or non-prejudicial, as cognizable under § 2254. *See, e.g.,* Conklin v. Schofield, 366 F.3d 1191, 1210 (11th Cir. 2004) (applying pre-AEDPA standard of review and denying claim that trial court errors and conduct of trial counsel combined to rob petitioner of fair trial and sentencing, but not relying upon Supreme Court precedent for its decision); Sims v. Singletary, 155 F.3d 1297 (11th Cir. 1998) (applying pre-AEDPA standard of review and holding that district court erred in finding that cumulative guilt stage errors prejudiced petitioner during penalty phase); Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997) (applying pre-AEDPA standard of review and declining petitioner's invitation to entertain "cumulative error" claim because petitioner's trial was not fundamentally unfair; Dobbs v. Kemp, 790 F.2d 1400, 1505 (11th Cir. 1986) (applying pre-AEDPA standard of review and denying petitioner's claim that improper prosecutorial argument and evidentiary errors rendered trial fundamentally unfair) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1973)).

In any event, cumulative effect analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors. *See* Morris v. Sec'y, Dep't of

Corr., 677 F.3d 1117, 1132 (11th Cir. 2012) (cumulative error claim fails in light of the absence of any individual errors to accumulate); United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004) (where no individual errors have been demonstrated, no cumulative errors can exist).  Thus, Petitioner must show error with respect to at least two of his individual claims.

As previously discussed, Petitioner has not shown error of a constitutional dimension with respect to any of the alleged errors asserted in his federal habeas petition; therefore, he is not entitled to federal habeas relief on this "cumulative effect" claim.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  Miller-El v.

Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting

§ 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has

shown that 'jurists of reason could disagree with the district court's resolution of his

constitutional claims or that jurists could conclude the issues presented are adequate

to deserve encouragement to proceed further.'"  Buck v. Davis, 580 U.S.—, 137 S. Ct.

773 (2017) (citing Miller-El, 537 U.S. at 327).  The petitioner here cannot make that

showing.  Therefore, the undersigned recommends that the district court deny a

certificate of appealability in its final order.

     The second sentence of  Rule 11(a) provides:  "Before entering the final order,

the court may direct the parties to submit arguments on whether a certificate should

issue."  Thus, if there is an objection to this recommendation by either party, that party

may bring this argument to the attention of the district judge in the objections permitted

to this report and recommendation.

     Accordingly, it is respectfully **RECOMMENDED**:

1.     That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 24th day of July 2017.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.   If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**